1   **WO**

2

3

4

5

6                   IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9   W.   ERIC   HULSTEDT,   permanent)        No. CV-09-1258-PHX-MHM
    guardian and permanent conservator of)
10  DAVID HULSTEDT, and adult, as)            **ORDER**
    guardian ad litem for D.H., a minor;)
11  WALTER   HULSTEDT   and   JANICE)
    HULSTEDT,                              )
12                                         )
13            Plaintiffs,                  )
                                           )
14  vs.                                    )
                                           )
15                                         )
                                           )
16  CITY OF SCOTTSDALE, ARIZONA;)
17  RICHARD   SLAVIN;   DEVEN)
    FELLOWS;   MARCOS   GARCIA;)
18  FRANK   O'HALLORAN;   HUGH)
    LOCKERBY; MARK CLARK; DANIEL)
19  GREENE; BROOKE SCRITCHFIELD;)
    MICHAEL   HERTKO;   MATTHEW)
20  MILLER;   SCOTT   SMITH;   MARK)
21  TOSCHIK; WENDY FIELD; LARRY)
    M A R M I E ,   J R . ;   E U G E N E)
22  McCLANAHAN; BRIAN HARTMAN;)
23  BRIAN RAUCH; CHRISTINA TROTT;)
    and DOES 1-10,                         )
24                                         )
25            Defendants.                  )

26  _____

27

28
              Currently before this Court is Defendants' Amended Motion for Judgment on the

Pleadings, (Doc. 69). Having carefully considered the Parties' pleadings and determined that oral argument is unnecessary, the Court issues the following Order.

## I.   BACKGROUND

### A.   Procedural History

Plaintiffs filed this lawsuit on June 11, 2009, alleging numerous claims for civil rights violations under 42 U.S.C. §1983. (Doc. 1). Plaintiffs filed their First Amended Complaint on October 7, 2009, adding state law causes of action against certain Defendants for negligence, defamation, intentional infliction of emotional distress, negligent intentional infliction of emotional distress, and loss of consortium. (Doc. 28). On June 23, 2010, Defendants filed the instant Amended Motion for Judgment on the Pleadings, (Doc. 69). Plaintiffs responded on July 6, 2010, (Doc. 76), and the motion became fully briefed on July 16, 2010. (Doc. 83).

### B.   Facts

At all times relevant to this lawsuit, Plaintiff David Hulstedt was under the care of a psychiatrist, Dr. Koleshc. (Complaint, ¶17–18). On November 7, 2008, David sought treatment from Dr. Kolesch for prolonged sleep deprivation and his fear that he was under surveillance by government helicopters. (Id. ¶18). Soon after returning home from his appointment, David called 9-1-1 and informed the operator—Defendant Christina Trott—that there was a crisis at his home and demanded that Arizona Governor Janet Napolitano come to the home. (Id. ¶20). After David hung-up the phone, Trott called back to the house and spoke with Janice Hulstedt, David's mother. (Id. ¶23). In response to Trott's questions concerning a baby she had heard crying during her conversation with David —minor Plaintiff

D.H.— Janice Hulstedt informed Trott that D.H. was crying because her diaper needed to be changed. (Id.). Soon thereafter, at approximately 12:22 PM, Trott dispatched police officers to the Hulstedt's home for an "Unknown Problem." (Id. ¶24). At 12:32 PM, Trott ordered Janice and Walter Hulstedt to go outside and meet the officers that had been dispatched to their home. (Id. ¶38). Janice and Walter Hulstedt complied, leaving David and D.H. alone in the home. (Id. ¶40).

Shortly after meeting the dispatched officers, the officers ordered Janice and Walter Hulstedt to a location a considerable distance away from their home. (Id. ¶41). At 12:34, Defendant Officer Hertko declared "a barricade situation," involving a "918," the police code for a mentally ill person. (Id. ¶42). Defendant Officer O'Halloran repeatedly denied Walter Hulstedt's requests to return to the home to obtain medication for and meet with David. (Id. at 46–8).

It was made known to the officers that David was having a nervous breakdown, and prior to the shooting, officers were also made aware that David was under psychiatric care for paranoid delusions and that David believed that police were conspiring to kill him. (Id. ¶¶ 49-50). The police also knew David was unarmed and had no history of violence. (Id. ¶¶50, 64–69 ). Officer Sergeant Stumpf spoke with Dr. Kolesch and informed him of the situation at the home, but refused Dr. Kolsech's offer to speak with David and attempt to talk him down. (Id. ¶¶52–56). The officers also refused the assistance of David Rubin, a family attorney who offered to calm David down and bring the incident to a conclusion. (Id. ¶¶60–63). Plaintiffs also allege that the officers repeatedly thwarted the attempts of David's family to speak with David and resolve the situation. (Id. ¶¶70–76). Eric Hulstedt, David's

brother, contacted David by cellular phone, but was ordered to hang up by O'Halloran, who further ordered subordinates to prevent the family from making contact with David.  (Id. ¶76).  Plaintiffs state that O'Halloran told subordinates he wished to isolate David from all sources except the Scottsdale Police Department ("SPD").  (Id. ¶77). At 1:41 PM, O'Halloran broadcast a radio message stating that David had threatened  to pile drive his daughter, D.H, into the ground, unless David's brother Eric was permitted to enter the home. (Id. ¶78).

Between the hours of 1:19 PM and 1:58 PM David spoke on approximately nine occasions with SPD negotiator William Antrim, who assured David that the police would not shoot him if he would just come outside with D.H.  (Id. ¶83).  After being promised by Antrim that he would not be shot if he exited the house, (Id. ¶¶102–06), David came outside the front door with D.H., (Id. ¶107), who was napping and laying over David's right shoulder.  (Id. ¶109).  At least three officers were outside the house and in front of David.  (Id. ¶113).   Officers yelled at David to raise his hands, and David complied picking D.H. up with both hands and raising her above his head.  (Id. ¶110).  Soon thereafter, David stated that he wished to go to the street to meet with his father, and began walking  northward on the street towards Janice, Walter, and Eric.  (Id. ¶114–115).   Defendant Officer Dorer blocked David's path, which caused David to turn around and begin walking back towards the house.  (Id. ¶¶116–17).  As he began to walk towards the house, Defendant Officer Slaving began shouting at David, "Put that child down! You put her down!"  (Id. ¶118).  A number of other contradictory commands were also yelled at David in that moment, including, "Put your hands up!", "Put the child down!", "Put your hands in the air!", and "Put

the baby down!".  (<u>Id.</u> ¶119).

Dorer and Slavin shot David in the back using high velocity .233 caliber hollow point projectiles.  (<u>Id.</u> ¶130).  The bullets caused David to lurch forward.  (<u>Id.</u> ¶133).  As he fell forward, David lost hold of D.H., who fell at least five feet to the ground, where her head struck the concrete sidewalk.   (<u>Id.</u> ¶136).Prior to being shot, David did not make any movement indicating he was about to throw D.H. (<u>Id.</u> ¶125). No verbal warning was given to David before lethal force was used. (<u>Id.</u> ¶129).  David suffered bullet wounds to his upper right back, left flank of the torso, and left upper buttock near the rectum.  (<u>Id.</u> ¶131).  The shooting has left David paralyzed from just above his waist to his toes.  (<u>Id.</u> ¶132).  As a result of her fall, D.H. suffered a skull fracture.  (<u>Id.</u> ¶138).  After the shooting, police handcuffed David and dragged him approximately 380 feet, causing his knees to scrape on the hard pavement.  (<u>Id.</u> ¶177-90).  As a result of the dragging, the skin was denuded from his knees.  (<u>Id.</u> ¶193).

## II.    DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants request that this Court enter judgment on the pleadings as to counts three, four, five, six, seven, and twelve of Plaintiff's First Amended Complaint.  Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." "Judgment on the pleadings is proper, when, taking all of the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." <u>Honey v. Distelrath</u>, 195 F.3d 531, 532–33 (9th Cir. 1999).  "[A] court may dismiss a complaint only if it is clear that

no relief could be granted under any set of facts that could be proved consistent with the allegation." <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 514 (2002) (internal quotation marks omitted).

## A. Count Three: False Arrest

In their third cause of action, Plaintiffs allege that the SPD arrested David Hulstedt without probable cause in violation of his constitutional right to be free from wrongful arrest. Defendants argue that judgment on the pleadings is proper because the SPD had probable cause to arrest David Hulstedt pursuant to Arizona's kidnaping and child abuse statutes. Specifically, Defendants allege that officer's had probable cause to suspect David was committing the offense of kidnaping by holding D.H. "for ransom, as a shield or hostage," A.R.S. § 13-1304(A)(2), and that David's conduct was indicative of child abuse, which occurs when:

> Under circumstances likely to produce death or serious physical injury, any person who causes a child or vulnerable adult to suffer physical injury or, having the care or custody of a child or vulnerable adult, who causes or permits the person or health of the child or vulnerable adult to be injured or who causes or permits a child or vulnerable adult to be placed in a situation where the person or health of the child or vulnerable adult is endangered

A.R.S. § 13-3623(A). Plaintiffs deny that there was probable cause for officers to arrest David for either of these crimes. Their arguments, however, are unpersuasive, and Plaintiffs' wrongful arrest claim must be dismissed.

A police officer has probable cause to arrest a suspect when "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had

committed or was committing an offense." <u>Hart v. Parks</u>, 450 F.3d 1059, 1066 (9th Cir.

2006) (internal quotations omitted).  To escape liability for false arrest based on the presence

of probable cause, a police officer must prove that "under the totality of the circumstances,

a prudent person would have concluded that there was a fair probability that [the suspect] had

committed a crime." <u>Id.</u> (internal quotations omitted).  A belief of "only the probability, and

not a prima facie showing, of criminal activity is the standard of probable cause." <u>Illinois v.</u>

<u>Gates</u>, 462 U.S. 213, 235 (1983). Finally, the existence of probable cause is an absolute

defense to a claim of wrongful or false arrest.  <u>Lacy v. County of Maricopa</u>, 631 F.Supp.2d

1183, 1194 (D. Ariz. 2008) (citing <u>Mustafa v. City of Chicago</u>, 442 F.3d 544, 547 (7th

Cir.2006)); <u>see</u> <u>Cabrera v. City of Huntington Park</u>, 159 F.3d 374, 380 (9th Cir.1998) ("To

prevail on his section 1983 claim for false arrest ... [the plaintiff] would have to demonstrate

that there was no probable cause to arrest him.").

Although the totality of the circumstances is not yet known, the facts in Plaintiffs'

Complaint make clear that there was probable cause for David Hulstedt's arrest.  After

officers arrived on the scene, David and police engaged in what Plaintiffs describe as a

"standoff" for over two hours, the majority of which David was alone in the house with D.H.,

and during which David threatened to pile drive D.H. into the ground if his brother Eric was

not allowed to enter the home.  When David eventually did exit the home, he did so carrying

a napping D.H. over his right shoulder.  Defendants assert that rather than appearing to be

napping, D.H. appeared prone and unconscious. While this Court must accept Plaintiff's

napping allegation as true (and does),  it does not alter the fact a police officer with the

information the SPD had could reasonably have, and apparently did, perceive D.H. as

unconscious.  And given David's pile-drive threat and generally unstable state of mind, the presence of a seemingly unconscious baby in the middle of a police standoff would give a police officer reason to conclude that David had followed through on his threat of harm against D.H., and that the injuries to D.H. were caused buy David.  Therefore, the Court finds that police had reason to suspect that David committed child abuse under A.R.S. § 13-1304(A)(2), and judgment on the pleadings as to this cause of action is warranted.

In so finding, the Court notes that whether or not David Hulstedt actually committed child abuse is irrelevant.  While Plaintiffs may yet prove that David's actions were in fact benign, they were of the variety from which a reasonable police officer could determine that there was a probability David had followed through on his threat to severely injure D.H..  Accordingly, Defendants motion for judgment on the pleadings as to count three is granted.

## B.    Count 6:    Violation of Fourteenth Amendment Rights

In their sixth cause of action, Plaintiffs' allege that the actions of Defendants Dorer and Slavin (i.e. shooting David Hulstedt) violated D.H.'s Fourteenth Amendment right to substantive due process.  The Supreme Court has long recognized that **"**the touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." County of Sacramento v. Lewis, 523 U.S. 833, 845-846 (1998) (internal quotations and citations omitted).  Plaintiffs' instant claim implicates the latter concern—abuse of executive power—and in such cases, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" Id. at 846 (quoting Collins v. Harker Heights, 503

U.S. 115, 129 (1992)).  Such behavior is constitutionally arbitrary only when it "shocks the conscious."  Id.  While the deliberate indifference of an officer is sufficient to meet the shocks the conscious standard under normal circumstances, the Supreme Court applies a higher standard in those situations where "unforeseen circumstances demand an officer's instant judgment." Id. at 854.   In such situations only, "a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation."  Id. at 836; see Porter v. Osborn, 546 F.3d 1131, 1139 (9th Cir. 2008) ("when an officer encounters fast paced circumstances presenting competing public safety obligations, the purpose to harm standard must apply."). Conversely, in "non-emergency" situations, the deliberate indifference standard applies.  See Porter, 546 F.3d at 1139 ("high speed chases are inherently emergency situations and," cannot be broken "into 'emergency' and 'non-emergency' situations in which the latter would be evaluated under the deliberate indifference standard.").

In their response brief, Plaintiffs concede that they have not alleged that Defendants Slavin and Dorer acted with a purpose to harm D.H..  Instead, they argue that this Court must apply the deliberate indifference standard to the facts of this case.  In support of their argument, Plaintiffs note that the standoff at the Hulstedt home unfolded over one and a half hours, giving them ample time to deliberate and plan how to deal with David.  Defendants, on the other hand, argue that the relevant timeframe in this case is the 12-second period of time between when David exited the house, picked D.H. up over his head, and was shot, requiring application of the purpose to harm standard. The Court agrees with Defendants.

As the Ninth Circuit explained in Porter, in discussing the application of the purpose

to harm standard, the Supreme Court draws "a distinction between situations that evolve in a time frame that permits the officer to deliberate before acting and those that escalate so quickly that the officer must make a snap judgment." See Porter, 546 F.3d at 1138.  While certain aspects of the standoff between David Hulstedt and police may have allowed for deliberation, when Hulstedt left his house and proceeded to raise his daughter over his head, police were confronted with an emergency situation that required split-second decision making. Given the potential threat posed to D.H.—that David intended to follow through on his threat to pile drive her—actual deliberation concerning how to respond to David's actions was impractical and potentially dangerous.   This was far from the type of controlled situation to which the deliberate indifference standard is applied. Lee v. City of Los Angeles, 250 F.3d 668, 684 (9th Cir. 2001) (applying deliberate indifference standard to wrongful incarceration).

In short, Defendants Dorer and Slavin were confronted with an urgent situation that unfolded over an exceedingly short period of time.  While reasonable people might take issue with the severity of Slavin and Dorer's response to the situation and their complicity in escalating it (as Plaintiffs clearly do), the Defendants behavior in this respect is not relevant to the question of the applicable standard.  Instead, such facts are relevant only to whether these Defendants acted with an intent to harm, a question that is not at issue in this case.  See Porter, 546 F.3d at 1140 (noting that "the record contains facts suggesting that [the officer's] own conduct created and agitated this escalating situation and that his reactions were disproportionate to the situation he faced," but that these facts are relevant to the question of whether the officer's "purpose was to harm [the plaintiff] for reasons unrelated to legitimate

law enforcement objectives.").  Defendants' assertion that Plaintiffs' Complaint does not allege that Defendants Dorer and Slavin acted with a purpose to harm D.H. is not contested by Plaintiffs.  Therefore this Court grants Defendants motion for judgment on the pleadings as to Count 6.

### C.    Counts 4 and 5: Loss of Family Society and Companionship

In counts 4 and 5 of his First Amended Complaint, Plaintiffs Walter, Janice, and Eric Hulstedt, on behalf of D.H., allege that the actions of Defendants Dorer and Slavin (their shooting of David Hulstedt) violated their right to substantive due process under the Fourteenth Amendment to the United States Constitution by depriving them of their rights to the familial society and companionship of David Hulstedt.  These claims are subject to the same legal standard as Plaintiffs' Claim 6; namely the Court must consider whether Plaintiffs have alleged facts which, when taken as true, demonstrate that Dorer and Slavin opened fire on David Hulstedt with the purpose to cause harm unrelated to the object of arrest.  As the Ninth Circuit has explained, this standard applies only in "'rare situations where the nature of an officer's deliberate physical contact is such that a reasonable factfinder would conclude the officer intended to harm, terrorize or kill.'"  Porter, 546 F.3d at 1141 (quoting Davis v. Township of Hillside, 190 F.3d 167, 172–73 (3d Cir. 1999) (McKee, J., concurring)).  Such a situation might arise "where force against a suspect is meant only to 'teach him a lesson' or to 'get even.'"  Id. (quoting Davis, 190 F.3d at 172–73). Plaintiffs have not alleged any facts in their Complaint which demonstrate that Defendants opened fire on David Hulstedt merely to harm, terrorize, or kill him, unrelated to the legitimate objective of arrest.  They argue, however, that the actions of these Defendants is unrelated to any legitimate law

enforcement purpose because they had ample time to plan and deliberate.  This Court, however, has already rejected this argument in discussing Plaintiffs' sixth cause of action; the officers did not have ample time to deliberate.  Accordingly, judgment on the pleadings is proper as to claims four and five.

### D.     Count Seven: Unlawful Search and Seizure

Plaintiffs' seventh claim for relief alleges that numerous Defendants violated Plaintiffs Walter and Janice Hulstedt's Fourth Amendment rights to be free from unlawful search and seizure by entering their home without a search warrant.  Before addressing Defendants' substantive arguments with respect to this claim, the Court will set forth the relevant facts from Plaintiffs' Complaint.

Plaintiffs allege that prior to the shooting Defendants Officer Dorer, without a warrant, directed Defendants Officers Miller, Field, and Hertko to enter the three-car garage attached to the Hulstedt home, and take up positions approximately twenty feet inside the garage. (Complaint ¶¶194–95).  Dorer later directed Defendants Officer Rauch to enter the garage. (Id. ¶195).  Likewise, Plaintiffs' Complaint alleges that prior to the shooting Officer Defendants Toschick, McClanahan, and Hartman also entered the garage without a warrant and took up positions twenty feet inside. (Id. ¶196).  After the shooting, Plaintiffs allege that Dorer ordered Slavin to form a search team to clear the house, and that Defendants Officers Slavin, Smith, Marmie, Hertko, Toschick, McClanahan, Hartman, Miller and Field searched the Hulstedt's residence. (Id. ¶200–01).   Later, Smith and Marmie reentered the home without a warrant, allegedly to search for prescription medications.

"[W]arrants are generally required to search a person's home or his person unless the

exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." <u>Mincey v. Arizona</u>, 437 U.S. 385, 393-39 (1978).  One such exigency is "the need to assist persons who are seriously injured or threatened with such injury."  <u>Brigham City v. Stuart</u>, 547 U.S. 398, 404 (2006).  This "emergency aid exception" holds that "law enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" <u>Michigan v. Fisher</u>, 130 S. Ct. 546, 548 (2009) (quoting <u>Brigham City</u>, 547 U.S. at 403)).  In applying the emergency aid exception, courts may not consider the officer's subjective intent or the seriousness of the crime he is investigating.  <u>Id.</u>  Instead, a court "asks whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) [if] the search's scope and manner were reasonable to meet the need."  <u>United States v. Snipe</u>, 515 F.3d 947, 952 (9th Cir. 2008).  Defendants argue that the emergency-aid exception justifies their various warrantless entries into the Hulstedt residence.

### 1.    Pre-shooting entry

The Court turns first to the pre-shooting incursions into the Hulstedt garage.  Defendants contend that their entries into the garage were objectively reasonable in light of David's bizarre behavior and refusal to exit the home and release D.H..  Plaintiffs, on the other hand, argue that the incursion into the garage was unreasonable because the police had no reason to suspect that D.H. was in immediate danger.  In support of their position, Plaintiffs point out that David had no history of violence and had not yet made any threats

to D.H..  The Court agrees with Defendants.

Plaintiffs' Complaint states that David made a 9-1-1 call during which he self-reported a "crisis" and demanded that Governor Janet Napolitano be sent to his home.  Additionally, the Computer Aided Dispatch ("CAD") entries provided to the officers depicted a dangerous and chaotic scene at the Hulstedt residence.  One warned:

> Requests Governor to come to his house; baby crying. Male saying there is a crisis; baby crying next to phone; male would not answer questions; said there is a crisis at his house and to get her there right now; would not say if child was hurt; sounded like very small infant. Attempt to call back. No history there.

(Complaint, ¶24).  Another CAD informed officers that upon calling the Hulstedt residence back, the 9-1-1 operator spoke with a woman who "seems unable to answer questions," and "sounded like she could not speak freely."  (Id. ¶27).  Finally, another CAD warned officers: "Son on the line refusing to give back the baby. . . . he will not give the baby up until Janet the governor gets here."  (Id. ¶34).  Additionally, before being ordered into the Hulstedt garage, officers had been informed that David was having a nervous breakdown, and heard D.H. crying from inside the home.

Plaintiffs admit in their Complaint, and the Court agrees, that the CAD entries "conveyed a sinister connotation."  (Id. ¶34).  While Plaintiffs make clear that they disagree with the tone and content of the CADs, the fact remains that these "sinister" CADs informed the officers' understanding of the situation at the Hulstedt home.  See Snipe, 515 F.3d at 953 (analyzing objective reasonableness of a warrantless entry by focusing on facts officers knew at the time of the entry).  What the officers knew therefore was that they were responding to a crisis involving a man having a nervous breakdown who was holding his baby hostage until

Governor Janet Napolitano arrived at the residence. The potential for injury in such a situation—especially because it involved a child—is clearly very high, and the Constitution does not require officers to delay entry into a home until violence has actually occurred. Bingham, 547 U.S. at 405 ("The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties.") Under these circumstances, it was not objectively unreasonable for the officers to conclude that there was an immediate need to protect D.H. from harm. See Snipe, 515 F.3d at 953 (" As we consider the totality of the circumstances here, we begin by observing that the officers knew that they were responding to an emergency call by 'a hysterical male' who instructed the dispatcher to '[g]et the police over here now' and that call alone largely justified their response.").

Having determined that the officer's actions satisfy the first prong of the emergency aid exception test, the Court turns now to the second: whether the manner and scope of the officers' entry was reasonable. Officers entered the garage so that they could quickly enter the house in the event David began to hurt D.H. This appears to have been a measured and prudent response to the situation. Additionally, the entry into the garage was not unannounced. The owners of the home, Walter and Janice Hulstedt, were both aware of the police presence, as was David. Id. at 954 ("Massey and Rodriguez knocked and announced their presence before entering the residence."). This Court finds therefore that the entry was reasonable and will enter judgment on the pleadings as to Plaintiffs' pre-shooting warrantless entry claim.

## 2. Post-shooting warrantless entries

### A. Post-shooting sweep of the home

Defendants argue that the warrantless sweep of the Hulstedt home immediately following the shooting was objectively reasonable for two reasons: (1) officers needed to ensure that nothing in the home presented a danger to officers or, upon their reentry, the Hulstedts; and (2) officers needed to protect D.H.'s health and safety.

The Court turns first to Defendants' protective search rationale for their post-shooting warrantless sweep. "[W]hen officers have arrested a person inside his residence, the exigent circumstances exception permits a protective search of part or all of the residence when the officers reasonably believe that there might be other persons on the premises who could pose some danger to them." United States v. Castillo, 866 F.2d 1071, 1079 (9th Cir. 1988). In order to evoke this exception, however, a party must be able to point to "articulable facts which, taken together with rational inferences from those facts, [would] reasonably warrant [the warrantless] intrusion." Id. While such facts may exist in this case, the only facts that the Court may consider at this stage in the proceedings are those found in Plaintiffs Complaint. Nothing therein states or gives rise to an inference that officers believed or had reason to believe anyone remained in the house after David had exited with D.H.. Nor do those facts suggest that other dangers existed in the house which could justify a warrantless entry. Accordingly, judgment on the pleadings is not proper based on Defendants' protective search rationale.

Defendants also argue that the post-shooting sweep was reasonable because it was undertaken to protect D.H.'s health and safety. Specifically, they argue the sweep was necessary to uncover evidence concerning the cause of D.H.'s injuries, as such information may have been necessary for doctors to successfully treat D.H. Because Defendants allege

they entered the home to protect D.H. from further harm, the Court applies the same two-part test under which this Court analyzed the pre-shooting warrantless entry.   Accordingly, Defendants must have had a "reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm." Snipe, 515 F.3d at 952.  They have not pointed, however, to any facts in Plaintiffs' complaint that suggest acquiring information concerning the source of D.H.'s injuries was necessary to protect D.H. from further serious harm, and the Court's review of the Complaint has turned up none. Nothing in the Complaint suggests, for example, that paramedics or doctors were having difficulty determining the cause of D.H.'s injuries or providing her with proper medical treatment.  In short, while there may in fact have been an objectively reasonable basis for sweeping the home, the Court is limited to the facts in the Complaint.  And the Complaint does not contain sufficient information concerning the aftermath of the shooting to allow this Court make a definitive determination about the sweep at this stage in the litigation.   Accordingly, Defendants' motion for judgment on the pleadings is denied as to the post-shooting sweep of the Hulstedt home.

## B.    Post-shooting entry to look for medications

Finally, the Court turns to the post-shooting search of the Hulstedt residence that occurred after the initial sweep of the home.  Defendants inform the Court that they re-entered the home to search for medications.  The argue the search was necessary because the cause of D.H.'s injuries were unknown and information concerning medications she may have ingested while in the house could have aided doctors in her medical treatment.  This argument is more or less identical to the second of the rationales Defendants used to justify

their warrantless sweep of the home.  For similar reasons, the Court must deny Defendants' motion.  Based solely on the facts in the Complaint, the Court cannot find that Defendants had an objectively reasonable basis to conclude that the search was necessary to protect D.H. from immediate harm.  While discovery may yet yield facts that explain the objective reasonableness of this search, by the time the second search occurred D.H. was already being treated for her injures, and the Complaint does not allege or suggest that doctors and paramedics had been unable to diagnose D.H. injuries and provide the appropriate treatment. Additionally, the Complaint is silent as to what event, if any, may have caused police to determine that the search was necessary to prevent immediate harm.    Defendants motion is denied.

### E.    Count 12: Defamation

Plaintiffs' twelfth cause of action is for defamation against officers Scritchfield, Clark, and Greene.  "To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation."  Turner v. Devlin, 174 Ariz. 201, 204 (1993) (quoting Godbehere v. Phoenix Newspapers, Inc., 162 Ariz. 335, 341 (1989)).  Defendants argue that Plaintiffs' claim must be dismissed because each of the allegedly defamatory statements is substantially true.  "Substantial truth is an absolute defense to a defamation action," Read v. Phoenix Newspapers, Inc., 169 Ariz. 353, 355 (1991), and therefore "slight inaccuracies will not prevent a statement from being true in substance as long as the 'gist' or 'sting' of the publication is justified." Id. When the pertinent facts are not in dispute, "the determination of substantial truth is a matter for the court." Fendler v. Phoenix Newspapers Inc., 130 Ariz.

475, 480, 636 P.2d 1257, 1262 (App. 1981).

### 1.     Clark's press release

The Court turns first to the allegedly defamatory statements of Officer Clark. Plaintiffs alleges that on November 7, 2008 Clark issued a press release that contained the following false assertions:  (1) that the Hulstedt family sought police assistance at the scene; (2) Janice or Walter told police they feared David would hurt D.H. or that David refused to give D.H. to them; (3) that David's threat to pile-drive D.H. was isolated (Plaintiffs assert it was caused by the SPD's decision to completely isolate David from his family); (4) that D.H. was injured before falling out of David's arms as a result of the shooting; (5) that D.H. had been injured by David prior to the shooting; and (6) that blood was found inside the home.   (Response, Doc.76**,** p. 15).   Defendants argue that these statements, even if technically false, are substantially truthful and therefore Plaintiffs' claim against Clark must be dismissed.

David's actions, even as portrayed by Plaintiffs, place David in a very unfavorable light and are undoubtedly damaging to his reputation.  David initiated a standoff with the police that placed his daughter in harms way, and in the end she was harmed. He also threatened to physically harm D.H., telling police he would pile drive her into the ground. Accordingly, even if Clark was not truthful when he wrote that the Hulstedts sought police assistance, that Janice and Walter Hulstedt feared David would injure D.H., and that David's threat against D.H. was unprovoked, these falsities do nothing to make the events of November 7, 2008 appear worse than they actually were and do not change the gist of what occurred that day.  The allegedly false statements in Clark's press release concerning the

responsibility for D.H.'s injuries, however, present a more difficult question.

Clark's press release places the blame for D.H.'s injuries clearly on David, conveying a version of events in which David harmed D.H. before exiting the home.  It states that Detectives found blood inside the Hulstedt residence, and that when David emerged from the house with D.H., blood was coming from D.H.'s ear and there was blood on David's shirt. These statements strongly suggest that David physically abused D.H..  On the other hand, in Plaintiffs' version of the story, David did not harm or abuse D.H.. Instead, the cause of D.H.'s injuries was solely her fall from David's arms after David had been shot by the police. Even assuming, as it must, that Plaintiffs are correct about the source of D.H.'s injuries, the facts still remain that David placed D.H. in harms way, threatened to harm her, and she was ultimately harmed.  This Court therefore must not merely consider whether Clark's portrayal of David harmed David's reputation, but whether the sting of the suggestion that David personally inflicted D.H.'s injuries is worse than the sting of Plaintiffs version of the story. In other words, the Court must determine whether the true cause of D.H.'s injuries is a distinction without a difference as it relates to the harm done to David's reputation.

After careful consideration, the Court finds that it is not.  The events of November 7, 2008 appear more sinister and less forgivable when David is portrayed as having physically harmed his daughter prior to the police's arrival.  Although it is small, there is a distinction between threatening to harm, and actually harming, a child.  Accordingly, the Court finds that the sting of Clark's press release—that David personally caused D.H.'s injuries— is greater, albeit slightly, than the sting of the story as told by Plaintiffs.  See Read, 169 Ariz. at 356 (comparing the sting of two competing versions of events).  It is therefore likely to

have caused greater damage to David's reputation than otherwise would have incurred, as child abuse is a terrible crime that properly elicits the greatest levels of societal opprobrium. Consequently, at this stage in the proceedings, substantial truth is not a defense to the statements in the Clark press release that portray David as having personally caused D.H.'s injuries, and Defendants' motion for judgment on the pleadings as to the defamation claim against Clark is denied. For the same reason the claims against Greene and Scritchfield—both of whom are also accused of making statements suggesting that David abused D.H.—may also proceed.

**Accordingly,**

**IT IS HEREBY ORDERED** granting in part and denying in part Defendants' Amended Motion for Judgment on the Pleadings. (Doc. 69). The Court grants Defendants' motion as to Plaintiffs' counts three, four, five, and six, and denies it as to count 12. As to count 7, the Court grants in part and denies in part. Defendants' motion is granted as to the pre-shooting warrantless entry, but denied as to the post-shooting warrantless entries.

**IT IS FURTHER ORDERED** directing the Clerk of the Court to reassign this case.

DATED this 15th day of March, 2011.

_____
Mary H. Murgula
United States District Judge

- 21 -