**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| W. Eric Hulstedt, permanent guardian and permanent conservator of David Hulstedt, an adult, et al., | No. CV-09-1258-PHX-GMS |
| Plaintiffs, | **ORDER** |
| vs. | |
| City of Scottsdale, et al., | |
| Defendants. | |

Pending before the Court are Plaintiffs' Motion for Partial Summary Judgment (Doc. 265), Defendants' Motion for Partial Summary Judgment (Doc. 271), Plaintiffs' Motion for Reconsideration (Doc. 333), and Plaintiffs' Motion for Certification of Issue for Interlocutory Appeal. (Doc. 334). For the reasons stated below, each motion for summary judgment is granted in part and denied in part, and both other motions are denied.

**BACKGROUND**

On November 7, 2008, at approximately 12:20 pm, David Hulstedt ("David") called 9-1-1. Operator Christina Trott of the Scottsdale Police Department ("SPD") answered. David told Operator Trott that he had "an emergency here" and that "I need to have Janet Napolitano come to my house." (Doc. 313-1, Ex. B at 1). In the background, Trott could hear David's two-year-old daughter, D.H., crying. Trott asked David the nature of his emergency, whether he was armed, and whether he was hurting the child, but David refused to answer

and instead hung up the phone. Trott issued a call for an "unknown problem" at David's address. (*Id.* at 2). She designated the call as level one out of nine levels used by SPD. Level one, the highest designation available to SPD operators, is usually reserved for bank robberies or rapes, and is a higher priority, for example, than a home invasion in progress. (Doc. 272-1, Ex. C). After notifying dispatch of the issue, Trott telephoned the number back. David's father, Walter Hulstedt ("Walt"), answered, but spoke only briefly before David came on the line and once again asked for the Governor to be sent to his house. David's mother, Janice Hulstedt ("Janice") then came on the line. Apparently unaware that David had called 9-1-1, Janice seemed surprised that the police had called her house. As Trott spoke with Janice, D.H. could be heard crying in the background, and at least one of the men could be heard shouting. Janice stated that the baby was crying because they "[p]robably need[] to change the diaper . . . and we've been screaming." (Doc. 313-1, Ex. B at 4).

After being questioned further by Trott, Janice explained that the family had just returned from the doctor, that they were having a family "indifference," and that David was having "a nervous breakdown." (*Id.* at 4–6). Janice spoke calmly but with a slightly nervous tone. Although Janice answered all of Trott's questions, Trott suggested that she was being evasive and was not providing accurate information. For example, after Janice mentioned her son David, Trott stated that Janice "said there was nobody there but you and your husband," although Janice had in fact made no such statement. (*Id.* at 5). Janice confirmed that the baby was safe, and acknowledged that David's behavior was abnormal. (*Id.* at 7–8). David took the phone back, stated that he was holding the baby, and asked that the Attorney General be sent to his house. He then hung up the phone. (*Id.*).

Multiple police officers, including Sergeant Jason Stumpf, Officer Wendy Field, and Officer Michael Hertko, began to respond to the call. The transcripts of conversations between officers over SPD radio frequencies demonstrate that those officers had been told that someone was asking for the Governor, a baby was screaming in the background, and that "[n]obody's answering the call taker's questions as far as what's going on there." (Doc. 313-

1, Ex. B at 9). Officer Field was the first to arrive on the scene; by the time she was there, Trott had called the house again and reached Walter. Walter sounded anxious, stated that David was holding the baby, and that he needed "to take a pill so I can—don't have a heart attack." (*Id.* at 13). Trott instructed Walt and Janice to leave the house and speak to the officers. Walt and Janice obeyed her instruction, leaving D.H. alone inside with David. They were in contact with officers outside the house by approximately 12:32 pm. (*Id.* at 16).

Officer Hertko entered the covered garage area of the home. David opened the door leading from the house to the garage; he was holding D.H. as he did so. (Doc. 272-1, Ex. B at 19–21). As described by Officer Hertko, David was cradling D.H. against his chest. (Doc. 266-1, Ex. A-3, Ex. 186–87). According to Hertko, the child was moving around while David held her and did not appear to be in distress. (Doc. 266-4, Ex. N at 9). David again asked for public officials to come to his house, and, when officers attempted to engage him, he re-entered the home in a manner described alternately as "running" or "hurriedly retreating." (Doc. 272-1, Ex. B at 27). He opened the door and shouted at Officer Hertko a number of times, at least once without D.H. present. (Doc. 266-4, Ex. N at 6).

At 12:34, Officer Hertko stated over the radio that it "looks like we're going to have a barricade situation." (Doc. 313-1, Ex. B at 16). During this period, Janice and Walt had been speaking to officers on the scene. Walt had informed Officer Field that a firearm was hidden in the house, but that David did not know where, and that there was no ammunition in the house. (Doc. 272-1, Ex. D). Walt further told Officer Field that David had earlier threatened to throw D.H. out a window if Walt did not come over to him. (Doc. 272-1, Ex. D at 57). At 12:36, Officer Hertko transmitted over SPD radio that, "prior to our arrival, he threatened to drop the child out of a window . . . . In dialogue with the police on the scene, he's merely stated that he wants the Attorney General . . . and  made no threats towards us or the child, although he is still holding the child and inside the residence somewhere." (Doc. 313-1, Ex. B at 18).

/ / /

- 3 -

1    Other officers continued to arrive on the scene, including Lieutenant Francis
2    O'Halloran, who served as incident commander and who had established control by 1:07pm.
3    (Doc. 313-1, Ex. B at 16). One group of officers, led by Sergeant James Dorer, established
4    an inner perimeter, in which officers were up against the wall of the house, including Officer
5    Field and at least two others. (Doc. 267-3, Ex. BB at 9). Officer Field was equipped with a
6    Taser and the other officers were equipped with "breaching" equipment sufficient to take
7    down a door. (Doc. 267, Ex. S at 10). The inner perimeter, alternately referred to as the
8    "crisis team," was prepared, "if we got any indication that he was hurting the child," to "force
9    entry and go to do a crisis rescue." (*Id.* at 19). An outer perimeter was established and led by
10   Sergeant Stumpf. (Doc. 267-3, Ex. BB at 9).

11   During this period, David's brother, Plaintiff W. Eric Hulstedt, also arrived on the
12   scene. Sergeant Stumpf contacted David's psychiatrist, Dr. Koelsch, who informed him that
13   David had been treated for anxiety and paranoid schizophrenia. (Doc. 270-2, Ex. JJJ at 72).
14   Family members and Sergeant Stumpf spoke to Lt. O'Halloran, informing him that David
15   had been advised by his minister the day before to go to the hospital, and had seen his doctor
16   that morning. (Doc. 267-3, Ex. BB at 6). According to Lt. O'Halloran, although various
17   information was being transmitted over the radio, including David's requests for the
18   Governor and his alleged threat earlier in the day to throw D.H. out the window if his father
19   did not approach, "none of that made sense with what was going on," and it was not clear to
20   Lt. O'Halloran who had been the source for what information. (Doc. 267-3, Ex. BB at 14).
21   On more than one occasion, David exited or partially exited the house and spoke to the
22   officers. On these occasions, he asked either for the Governor or the Attorney General, as
23   before, or for family members. Sergeant Dorer stated over the radio that David had stated "he
24   wants to talk to his dad, wants to talk to the Attorney General, et cetera." (Doc. 313-1, Ex.
25   B at 34).

26   Officer Daniel Antrim and Officer William Hathaway, who served as hostage
27   negotiators, made contact with David over the phone at approximately 1:25 pm. (Doc. 313-2,

28

- 4 -

Ex. L-2). The negotiators were supervised by Sergeant Larry Marmie. Officer Antrim spoke directly to David, while Officer Hathaway spoke to Officer Antrim, and occasionally reported on the negotiation's progress over the police radio system. (Doc. 313-2, Ex. L-2). David frequently hung up on Officer Antrim, who continued to call him back. At five minutes into one of their conversations, David stated that he was not going to answer the phone unless his brother Eric was sent into the house. (Doc. 313-2, Ex. L-2 at 2).[1] While the negotiators were talking with David, his family members, including his parents, his brother Eric, and Eric's wife Sara Hulstedt, were also in contact with David by telephone. (Doc. 313-1, Ex. B at 47). David stated that he believed the police were not interested in his safety, were only present to protect D.H., and were planning to shoot him. (*Id.*).

At some point before 1:37 pm, David told Officer Antrim that he would "pile-drive" his daughter into the ground if his brother Eric was not sent into the house. (Doc. 313-2, L-2 at 4). Officer Antrim whispered "pile-drive" to Officer Hathaway, who broadcast "Subject made a comment about pile driving the child," over the radio at 1:37 pm. (Doc. 313-2, Ex. L-2 at4; Doc. 313-1, Ex. B at 47). Three minutes later, Lt. O'Halloran radioed the inner perimeter, as follows: "He said that if his brother doesn't come in, he's going to pile-drive his three-year-old daughter into the ground." (Doc. 313-1, Ex. B at 48). Eric was not sent into the house, and no further threats were broadcast over the police radio. Lt. O'Halloran then made a call for a SWAT team. (Doc. 267-3, Ex. BB at 29). Lt. O'Halloran decided that having family members speak to David, as David had requested, would "not help resolve the scene at all" and ordered officers to confiscate the family members' cell phones. (Doc. 267-3, Ex. BB at 34).

Sergeant Richard Slavin, who had previously contacted Operator Trott to determine

---

[1] The transcript of the negotiations captures only what Officer Hathaway and Officer Antrim said. Any statements attributed to David based on that recording are based on statements by Officer Hathaway or Officer Antrim in the transcript that David made the statements.

the location of the incident, responded to the call for SWAT team members. (Doc. 313-1, Ex. B at 43, 51). He reached the vicinity of the house at 1:51 pm, but was still at least a few blocks away from the house itself. (Doc. 313-1, Ex. B at 53). Once the family members' cell phones had been confiscated, Officer Antrim continued to speak to David over the telephone, stating that "we're working on getting your brother but you do know as well as I do that this is not a real common practice to send someone into a home like that." (Doc. 313-2, Ex. L-2 at 5). After fifteen minutes of negotiation, David apparently once again expressed concern that the police were there to shoot him. Officer Antrim continued to negotiate, and learned more about David's anxiety and his medication. (Doc. 313-2, Ex. L-2 at 8).

Five minutes later, David told the negotiation team that he was ready to leave the house. (Doc. 313-2, Ex. L-2 at 14). When Sgt. Slavin, who was still putting on his SWAT team gear, heard over the radio that the subject was going to leave the house, he "started running down towards the command post." (Doc. 269, Ex. PP at 144). When Sgt. Slavin reached the command post, he told the officers there that he wanted to go to the scene, obtained directions from them, and continued running towards the house. (*Id.*). Sgt. Slavin had heard the previous radio transmissions, but was not aware of any operational plan, did not know how many officers were on the scene, and did not know if any officers had firearms at the ready or deployed. (Doc. 266-3, Ex. L-3 at 169–70). He made the decision to go to the scene on his own, passing through residential yards containing vegetation and cacti to reach the house. (*Id.*).

At 1:59 pm, Sgt. Marmie broadcast over the SPD radio that David "says he's coming out but he won't say how." (Doc. 313-1, Ex. B at 55). David exited the house at approximately 2:02 pm, more than half an hour after negotiations had begun, and more than twenty minutes after Lt. O'Halloran had broadcast that David had threatened to pile-drive D.H. if Eric were not let into the house. (Doc. 313-1, Ex. B at 56). He carried D.H. over his right shoulder, with her belly down and her head facing forward. (Doc. 268-1, Ex. HH at 3) When he exited, the officers near the door were speaking to him, and according to Sgt. Smith

they were "telling him put his hands up, to come out." (Doc. 268-1, HH at 3). Sgt. Dorer heard the officers giving "loud, precise, verbal commands," but at his deposition could not state the contents of those commands. (Doc. 266, Ex. D at 77:12–14). After David came out of the house he asked officers to back away so that he could walk to the street and see his father, and officers did back away to some degree. (Doc. 268-1, Ex. HH at 4). Sgt. Dorer believed that if the officers backed away, David would have "an avenue of escape," so he did not retreat. (*Id.* at 39). By the time David left the house, there were twelve officers in the inner perimeter, some of whom were equipped with less-than-lethal force options such as Tasers. (Doc. 314-5, Ex. W at 18–20). Sgt. Slavin continued to run towards the house from the command post up the street. (Doc. 266-3, Ex. L-3 at 169–70).

Sgt. Smith attempted to talk with David once David came out of the house. (Doc. 268, Ex. GG at 18–19). Smith had a Taser, but did not feel it would be proper to use it, because "[y]ou don't know with certain people exactly what that could do to that, cause a muscle contraction, and force the child down." (Doc. 268, Ex. GG at 20). David walked a few feet down the path. He made eye contact with Sgt. Dorer, who had moved from the side of the house to a position directly between the street and the front door, and who had his rifle pointed at David. (Doc. 267, Ex. S at 43; Doc. 266-1, Ex. D at 131–132). Once he made eye contact with Sgt. Dorer, David turned, with D.H. over his head, and started walking back towards the house. (*Id.*).

At some point after David turned around with D.H. over his head, Sgt. Slavin, who was now near the house, shouted "Put that child down!" (Doc. 313-1, Ex. B at 56). Sgt. Dorer aimed his rifle at the small of David's back and fired twice. Sergeant Slavin also fired twice, within seconds of shouting "Put that child down!" (Doc. 313-1, Ex. B at 57). Of the four shots fired, three hit David: one hit him in the lower back, one in the right buttock, and one in the back of his right shoulder. According to Dr. Philip Keen, the shot in the small of his back and his buttock were fired from one direction, while the shot that hit his shoulder was fired from another. (Doc. 270-2, Ex. HHH, at 13). According to diagrams of the house

on which they indicated their positions, when Sgts. Dorer and Slavin fired their weapons, Sgt. Dorer was approximately 34 feet from David and Sgt. Slavin was 96 feet from him. (Doc. 269-4, Ex. AAA).[2]

The Pospisil video captures the twelve seconds up to and including the shooting, and then records the scene after the shooting. (Doc. 269-3, Ex. YY-1, "Pospisil video"). Parties agree that the video does not, however, capture David from the moment he leaves the house. At the start of the video, David is holding D.H., who appears lethargic, on his right shoulder. He lifts D.H. up over his head and walks down the path towards the front of his house. His legs are not visible at all times, but he appears to take four or five steps forwards, turn around, and take two or three steps back towards the house before he is shot. D.H. falls head-first from his arms onto the concrete path. Pospisil moves the camera after the first shot, so the recording does not capture the impact of D.H. hitting the ground, but the video shows her falling face first on her right side. At no point does David make any move to rear back and throw D.H. to the ground. Once he lifts her above his head, at four seconds into the video, he keeps her there until his is shot, at twelve seconds into the video. He drops D.H. and begins to fall at the first shot; D.H. is ahead of him in midair when the second shot is fired. (Pospisil video).

Neither Sgt. Slavin nor Sgt. Dorer warned David that they would shoot him if he did not comply with their commands, and both of them shot him in the back as he was walking away from them and towards the house. (Doc. 313-1, Ex. B at 57, Pospisil video). Sgt. Dorer, when asked if he ever perceived at any particular moment that David was going to "pile-

---

[2] The report states that the two shots that hit David in the lower back were fired from where Sgt. Dorer was positioned and the one that hit him in the shoulder came from where Sgt. Slavin was positioned. Defendants do not challenge the contention that Sgt. Dorer fired the two shots that hit David in the back and Sgt. Slavin fired the shot that hit him in the shoulder and the one that missed. It is not clear which officer fired first, although the audio portion of the video recording, taken by David's neighbor, Michael Pospisil, confirms that the four shots were fired in quick succession.

1    drive" D.H., responded, "I did not." (Doc. 267, Ex. S at 44). Instead, he shot David "to

2    prevent him from going back into the house." (*Id.* at 43). When David was shot, he released

3    D.H. as he collapsed and she fell forward onto the concrete walkway from a height of

4    approximately six feet. (Pospisil video).

5          After David fell, officers converged on D.H. and David. (Pospisil video). Sgt. Dorer

6    and Sgt. Slavin approached David on the ground; Sgt. Dorer ordered him handcuffed and Sgt.

7    Slavin "ordered him to be dragged away from the scene." (Doc. 269, Ex. PP at 145). Officer

8    Deven Fellows and Officer Marcos Garcia handcuffed David and dragged him approximately

9    400 feet to where the medics were stationed. (Doc. 266-2, Ex. E at 136). The officers held

10    David under his arms with his face pointed downward, so that his bare knees were in contact

11    with the asphalt and gravel. The dragging resulted in "gaping wounds in David's knees" that

12    required extensive medical attention. (Doc. 270-2, Ex. HHH).

13          Immediately after the shooting, Sgt. Dorer asked Sgt. Slavin to form a search team and

14    sweep the house. Sgt. Slavin and other officers entered the house. (Doc. 266-6, Ex. R at 171).

15    Some time later, Sgt. Smith and Sgt. Marmie also entered the house; they later stated that

16    they entered to look for medications that David or D.H. might have ingested during the

17    standoff. (Doc. 266-2, Ex. H-19 at 152).

18          Between eight and thirteen minutes after the shooting, and after the search of the

19    house was complete, Officer Daniel Greene stated over the radio that he had seen blood

20    coming out of D.H.'s left ear prior to the shooting. (Doc. 313-1, Ex. B at 61). He further

21    stated that David held D.H. until she was only two feet over the ground before dropping her.

22    (*Id.*). No other officer, during or after the incident, reported seeing any blood coming out of

23    either of the child's ears. Officer Greene's statements were repeated over the police radio by

24    others, including Operator Trott. (*Id.* at 63). Officer Brooke Scritchfield repeated Officer

25    Greene's statements to medical officials treating D.H. (Doc. 29 ¶ 108). Officer Mark Clark

26    issued a press release on the day of the shooting that repeated Officer Greene's statements.

27    (Doc. 29 ¶ 100).

28

1   David was treated for three gunshot wounds, one to his lower back, one to his right

2   buttocks, and one to his right shoulder. (Doc. 270-2, Ex. HHH, at 13). He was rendered a T-

3   10 paraplegic by the shot to the lower back and has been fitted with a catheter and colostomy

4   bag. (Doc. 270-2, Ex. HHH at 3). In addition, the dragging resulted in "deep abrasions" to

5   both kneecaps. (*Id.*).

6   D.H. was treated by paramedics and air evacuated to Phoenix Children's Hospital

7   (PCH), where she was diagnosed with a "temporal skull fracture on the right" with "the

8   fracture line extended to the medial aspect of the temporamandibular joint cavity with the

9   widening of the suture entering into the right eustachian tube." (Doc. 29 ¶ 28). No injury to

10   the left side of her face was ever documented.

11   Detective Hugh Lockerby prepared an affidavit in support of a search warrant. (Doc.

12   318-4, Ex. FFFF at 9). A search warrant was obtained and executed that night. (*Id.* at S-B-O

13   003405).

14   Plaintiffs' complaint contains nine claims for relief under 42 U.S.C. § 1983 and seven

15   supplemental claims under Arizona state law.[3] (Doc. 28). In Claim One, Plaintiffs allege that

16   Officer Dorer and Officer Slavin violated David Hulstedt's Fourth Amendment rights by

17   using excessive force against him when they shot him. In Claim Two, they allege that Officer

18   Fellows and Officer Garcia violated David Hulstedt's Fourth Amendment rights by using

19   excessive force when they handcuffed him and dragged him across the asphalt, that Sgt.

20   Dorer is liable for ordering that David be handcuffed, and that Sgt. Slavin is liable for

21   ordering the officers to drag David to the ambulance. Counts Three through Six, along with

22   certain allegations in Count Seven, have already been dismissed on the pleadings by the

23

24

25

26   [3] The complaint contains two claims titled "Claim Nine." The Court will refer to them

27   as Claim Nine(a) and Claim Nine(b).

28

original judge in this matter. (Doc. 182).[4] In the remaining portions of Claim Seven, Plaintiffs allege that officers searched the Hulstedt home in violation of the Fourth Amendment after the shooting, and that Det. Lockerby procured a search warrant for the home through judicial deception. In Claim Eight, Plaintiffs allege that Lt. O'Halloran, Sergeant Scott Smith, Sergeant Dorer, and Sergeant Slavin bear supervisory responsibility under 42 U.S.C. § 1983 for directing their subordinates to act in ways that deprived Plaintiffs of their constitutional rights. Claim Nine(a) argues that the City is liable based on two theories of municipal liability: a failure to train officers and a ratification of the officers' decisions by the Chief of Police.

The remaining claims arise under Arizona state tort law. Claim Nine(b) is for Battery against Sgt. Slavin, Sgt. Dorer, Officer Fellows, Officer Garcia, and the City. Claim Ten is for Negligence by Sgt. Dorer, Sgt. Slavin, Det. Lockerby, and the City. Claim Eleven is for Negligence against Operator Trott and the City of Scottsdale. Claim Twelve is for Defamation against Officer Greene, Det. Lockerby, Officer Scritchfield, and the City. Claim Thirteen is for Intentional Infliction of Emotional Distress ("IIED") against Sgt. Slavin, Officer Scritchfield, Officer Clark, Officer Greene, Det. Lockerby, Officer Fellows, Officer Garcia and others. Claim Fourteen is for Negligent Infliction of Emotional Distress against Sgt. Slavin and Sgt. Dorer, and Claim Fifteen is for Loss of Consortium against Sgt. Slavin and Sgt. Dorer.

Defendants move for summary judgment on every claim. (Doc. 271). Plaintiffs move for summary judgment on Claim One, Claim Two, the remaining portion of Claim Seven, Claim Nine(a), Claim Nine(b), and Claim Ten. (Doc. 265).

---

[4] In these claims, Plaintiffs alleged False Arrest (Claim Three), Loss of Family and Companionship (Claims Four and Five), a violation of D.H.'s substantive due process rights (Claim Six), and an illegal entry into the house prior to the shooting (Claim Seven).

1

**DISCUSSION**

2

**I.    Legal Standard**

3          Summary judgment is appropriate if the evidence, viewed in the light most favorable

4    to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact

5    and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Substantive

6    law determines which facts are material and "[o]nly disputes over facts that might affect the

7    outcome of the suit under the governing law will properly preclude the entry of summary

8    judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A fact issue is

9    genuine 'if the evidence is such that a reasonable jury could return a verdict for the

10   nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)

11   (quoting *Anderson,* 477 U.S. at 248). When the nonmoving party "bear[s] the burden of proof

12   at trial as to an element essential to its case, and that party fails to make a showing sufficient

13   to establish a genuine dispute of fact with respect to the existence of that element, then

14   summary judgment is appropriate." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan*

15   *Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477

16   U.S. 317, 322–23 (1986)).

17          When the record contains a "videotape capturing the events in question," and that

18   videotape "quite clearly contradicts the version of the story told by" one party, the court need

19   not adopt that party's version of the facts, but should instead rely on the facts as presented

20   in the recording. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

21   **II.    Analysis**

22          Section 1983 of Title 42 of the U.S. Code provides a cause of action for persons who

23   have been deprived their constitutional rights by persons acting under color of law. Section

24   1983 "is not itself a source of substantive rights" but only provides a cause of action "for

25   vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3

26   (1979). When a plaintiff seeks to recover damages for an excessive force claim, "[t]he

27   validity of the claim must then be judged by reference to the specific constitutional standard

28

which governs that right, rather than to some generalized 'excessive force' standard." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Furthermore, "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* (emphasis in original).

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In making this determination, a court asks whether "the facts alleged show the officer's conduct violated a constitutional right" and "whether the right was clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (abrogated in part by *Pearson v. Callahan*, 555 U.S. 223 (2009)). For a right to be clearly established for the purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). Qualified immunity is "an immunity from suit rather than a mere defense to liability," and therefore "it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis deleted).

### A.   Claim One: Fourth Amendment (excessive force)—Sgt. Dorer and Sgt. Slavin

Defendants claim that even with all questions of fact resolved against them, they did not violate the Fourth Amendment. Alternately, they claim that they are protected from suit by qualified immunity for any Fourth Amendment violation they did commit. Plaintiffs likewise move for summary judgment, and claim that Defendants are not entitled to qualified immunity even when issues of facts are resolved in their favor. In Fourth Amendment claims, courts evaluate both the merits and the question of qualified immunity objectively. *See, e.g.*, *Wilson*, 526 U.S. at 614 (nothing that whether officers are entitled to qualified immunity

1    depends upon the "objective legal reasonableness of the action, assessed in light of the legal

2    rules that were clearly established at the time it was taken"). Nevertheless, since "reasonable

3    mistakes can be made as to the legal constraints on particular police conduct," the

4    examinations must be conducted separately. *Saucier*, 533 U.S. at 205.

5        Both sides have moved for summary judgment, and the motions cannot be resolved

6    without considering disputed facts in the light most favorable to each. As both parties

7    conceded at the hearing, however, there are relatively few disputed issues of fact here—most

8    of what was broadcast over the police radio was recorded and has been transcribed, and the

9    shooting itself was videotaped. Those facts that remain in dispute will be noted during the

10   analysis.

11                    **1.    Merits**

12       The Fourth Amendment protects "the right of the people to be secure in their persons,

13   houses, papers and effects, against unreasonable searches and seizures." U.S. CONST. amend.

14   IV. The Fourth Amendment applies to local law enforcement through the Due Process Clause

15   of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643 655 (1961). "[A]pprehension by

16   the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth

17   Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

18       Analyzing a Fourth Amendment excessive force claim requires "careful balancing of

19   the nature and quality of the intrusion on the individual's Fourth Amendment interests

20   against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396

21   (internal quotations omitted). Traditionally, this balancing is conducted in three steps. First,

22   a court must evaluate the "the type and amount of force inflicted." *Espinosa v. City and Cty.*

23   *of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). Second, the court considers the

24   government's interest in using force, relying upon "(1) the severity of the crime; (2) whether

25   the suspect posed an immediate threat to the officers' or public's safety, and (3) whether the

26   suspect was resisting arrest or attempting escape." *Id.* Having determined the force used and

27   the government's interest in using force, the court then "balance[s] the gravity of the

28                              - 14 -

intrusion on the individual against the government's need for that intrusion." *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003).

In addition to the major *Graham* factors, the Ninth Circuit has noted a number of other factors relevant to a *Graham* analysis. Courts must consider whether reasonable officers would have been aware that the suspect is an "emotionally distraught individual" as opposed to "an armed and dangerous criminal," *Deorle v. Rutherford*, 272 F.3d 1271, 1282 (9th Cir. 2001); *see also Glenn v. Washington Cty.*, ___ F.3d ___, 2011 WL 6760348, at *8 (Dec. 27, 2011) (holding that the fact that "[the victim]'s family did not call the police to report a crime at all, but rather to seek help for their emotionally disturbed son" was relevant to a *Graham* analysis). Before using force, officers must consider whether they might injure innocent bystanders in addition to the targets of the force. *See Boyd v. Benton Cty.*, 374 F.3d 773, 779 (9th Cir. 2004) (holding that officers violated the Fourth Amendment when they threw a "flash-bang" grenade into "an apartment where it was believed that there were up to eight people, most of whom were unconnected to the robbery and many of whom were likely asleep"). Further, although officers are not required to use the absolute minimum force necessary to subdue a suspect, before using force they must consider "the availability of alternative methods of capturing or subduing a suspect." *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005).

Even these factors, however, do not merely present additional items to consider during a multi-factor test—at its most basic, *Graham* asks a court to determine whether an officer's actions were reasonable, and "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Graham*, 490 U.S. at 396 (*quoting Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Although it will conduct a *Graham* analysis, the Court is mindful that the core of *Graham* is reasonableness, and as the Supreme Court has noted in another Fourth Amendment context, "[E]very Fourth Amendment case, since it turns upon a 'reasonableness' determination, involves a balancing of *all relevant factors*." *Whren v. United States*, 517 U.S. 806, 817 (1996) (emphasis added).

Among those relevant factors here was the fact that the officers were present at the scene principally to protect D.H.'s safety. (*See* Doc. 267-3, Ex. BB at 7 ("[I]t's always a big deal whenever a baby's involved with police officers, and we were involved.")). A reasonable officer would have only shot David, regardless of other concerns, if it was likely that by doing so he would prevent David from causing D.H. more harm than she would suffer resulting from the shot. As the Ninth Circuit has emphasized, a *Graham* analysis takes into account "the totality of the facts and circumstances in the particular case." *Blanford v. Sacramento Cty.*, 406 F.3d 1110, 1115 (9th Cir. 2005). The fact that the officers were present at the scene to protect D.H. remains a consideration in the Court's analysis as it considers the *Graham* factors.

The *Graham* factors will therefore not be applied in a vacuum, but with an eye towards how they relate to each other, and how they relate to the underlying question of whether a reasonable officer in either Sgt. Slavin or Sgt. Dorer's position would have fired at David.

### a.     Type and Amount of Force Used

There is no dispute of fact that both officers used deadly force when they shot David. The use of a firearm as deadly force is governed specifically by *Garner* and its progeny.[5] An officer may shoot a felony suspect "to prevent escape" so long as "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Blanford*, 406 F.3d at 1115 (quoting *Garner*, 471 U.S. at 11). When a suspect is not attempting to escape, the Ninth Circuit has emphasized that an officer may not fire "unless, at a minimum, the suspect presents an *immediate* threat to the officer or others." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) (emphasis added).

---

[5] Nevertheless, "[w]hether or not [an officer's] actions constituted application of 'deadly force,' all that matters is whether [his] actions were reasonable." *Scott v. Harris*, 550 U.S. 372, 383 (2007); *see also Acosta v. Hill*, 504 F.3d 1323 (9th Cir. 2007) ("[T]here is no special Fourth Amendment standard for unconstitutional deadly force.").

1    Both the Ninth Circuit and the Supreme Court have noted that even when

2  circumstances dictate that an officer may use a firearm, "whenever practicable, a warning

3  must be given before deadly force is employed." *Harris*, 126 F.3d at 1201 (citing *Garner*,

4  471 U.S. at 11–12). The Ninth Circuit has defined the warning required before using

5  force—even force that does not qualify as deadly force—as a "warning of the imminent use

6  of such a significant degree of force." *Deorle*, 272 F.3d at 12. Mere commands, absent a

7  statement that force will be used if the command is ignored, have not been found to constitute

8  adequate warning. In *Garner* itself, the officer "called out 'police, halt' and took a few steps

9  toward" Garner, and the Supreme Court nevertheless found it necessary to note that officers

10  must instead give a "warning" before using deadly force. *See Garner*, 471 U.S. at 3. Further,

11  in *Lehman v. Robinson*, 228 Fed. App'x. 697 (9th Cir. 2007) (judgment vacated by *Robinson*

12  *v. Lehman*, 552 U.S. 1172 (2008) reaffirmed by *Lehman v. Robinson*, 346 Fed. App'x. 118

13  (9th Cir. 2009)), officers ordered a suspect to drop a knife, without warning him that they

14  would shoot if he did not comply, and he did not do so. The Ninth Circuit found that the

15  officers violated the suspect's Fourth Amendment rights when they then shot him, in part

16  because they fired "without any 'warning of the imminent use of such a significant degree

17  of force.'" *Id.* at 700 (quoting *Deorle*, 272 F.3d at 1285). *See also Daniels v. Cty. of Ventura*,

18  228 Fed. App'x. 669, 670 (9th Cir. 2007) (holding that a shooting violated the Fourth

19  Amendment when officers ordered man armed with a knife to drop it and he did not, because

20  the officer "did not warn [the victim] that he would shoot"). Recently, the Ninth Circuit

21  found that officers who ordered members of a crowd to disperse before firing projectiles

22  filled with oleoresin capsicum ("OC") powder had not issued sufficient warning when there

23  was no evidence that the officers had stated "that force would be used against [the members

24  of the crowd] if they did not behave in a particular manner." *Nelson v. City of Davis*, ___

25  F.3d ___, 2012 WL 2821931, at *10 (9th Cir. Jul. 11, 2012).

26  / / /

27  / / /

28                                         - 17 -

1

### b.     The Government's Interest in Using Force

2   Under *Graham*, the government's interest in using force is to be "judged from the

3   perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

4   hindsight." *Graham*, 490 U.S. at 396. Officer Antrim correctly summarized the government's

5   interest in using force as a reasonable officer would have perceived it when he told David

6   that "we're here to ensure the safety of your child, sure of course that's one of our major

7   concerns, but yours as well too because you're under a lot of stress right now." (Doc. 313-2,

8   Ex. L-2 at 6). Defendants do not claim that David was placing himself in imminent harm

9   sufficient to justify the use of force. Nor would a reasonable officer, considering all of the

10  circumstances, have perceived that David presented an immediate threat to anyone other than

11  D.H. at the time he was shot. At that moment, David was holding D.H. above his head with

12  both hands and walking slowly back towards the house, and he was unarmed. The

13  government's interest in using force was limited almost exclusively to protecting D.H.'s

14  safety; the use of force itself instead resulted in harm to D.H. Because *Graham* is a holistic

15  test, other factors, such as the use of alternative means of force, officers' knowledge of

16  David's mental state, and the chance that using force would harm others will be considered

17  in tandem with the traditional factors.

18

### i.     Severity of the Crime

19  Prior to the officers' arrival, David had threatened to drop D.H. out a window, and this

20  threat had been relayed over the radio before most of them arrived on the scene. (Doc. 272-1,

21  Ex. D at 57). After the barricade was established, David threatened to "pile-drive" D.H., and

22  this threat was broadcast to other officers.[6] (Doc. 313-1, Ex. B 47). Officers who heard this

23  threat could reasonably believe that he had committed a crime by threatening D.H. The

24

25      [6] At the hearing on the motions, there was some discussion as to what in particular is
26  meant by "pile driving" another human being. A reasonable officer would have understood
    a mentally unstable man's threat to "pile-drive" a child as a threat to throw her forcefully
27  head-first to the ground.

28

totality of the circumstances in which this threat was made, however, included the facts that David was closely monitored after making the threat and took no action to carry out the threat. (Doc. 267 at 19). As the Ninth Circuit has noted, "the mere commission of prior crimes not justify the use of deadly force." *Haugen v. Brosseau*, 339 F.3d 857, 861 (9th Cir. 2003) (overturned on qualified immunity grounds by *Brosseau v. Haugen*, 543 U.S. 194 (2004)) (collecting cases in which prior crimes included participation in a major narcotics ring, assault, violent assault of a police officer, and firing a gun). David's threats against D.H., standing alone, do not justify the use of deadly force under the circumstances.[7]

### ii.   Imminent Harm

Whether or not David posed an "*immediate* threat to the safety of the officers or others" is "the most important single element of the three specified factors" of the *Graham* test. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) (emphasis added). When he was shot, David was not armed and was walking away from police officers. He was holding his daughter above his head and thus was not otherwise free to use his hands. He was not looking at police but walking slowly back towards his house. When David was in such a posture, no reasonable officer could have believed that David posed a threat to the police or to the general public. The only potential threat David posed was to D.H. herself.

Officers were aware that David had threatened D.H. earlier. However, a reasonable officer could not have concluded from that threat alone that David posed an immediate threat to D.H. sufficient to shoot David when he emerged from the house twenty minutes later. Time had elapsed, and the officers had coaxed him out of the house through substantial

---

[7] Here the Ninth Circuit's decision in *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) is instructive. In *Luchtel*, officers confronted a mentally ill person who, under the influence of crack cocaine, had run from her house with her young son and hid under a car with him. When the police arrived, the child was removed and Luchtel "stood up and declared that the officers were not actually the police but assassins trying to kill her." She then grabbed an elderly woman and held her as a human shield. The court found that the officers used reasonable force against the plaintiff when they lunged at her and forced her to the ground, dislocating her shoulder in the process. *Id.* at 982.

negotiation. David's demand had not been met, and neither Sgt. Dorer nor Sgt. Slavin had any evidence that he had hurt D.H. as a result. Sgt. Dorer's team had been monitoring the house, ready to force entry if there was any indication that David had injured D.H., and they had not done so. (Doc. 313-1, Ex. B at 32,37).[8]

Moreover, David was not the only threat to D.H.'s safety. A reasonable officer would perceive, as both Sgt. Dorer and Officer Smith testified they did perceive, that by using force against David a police officer would virtually ensure that D.H. would be dropped to the concrete. (Doc. 266-1, Ex. D-29 at 210:17–19).[9] Firing at David also created the risk that D.H. herself would be shot. A reasonable officer would have considered the imminent harm and risk of harm that firing would cause D.H., and would not have fired unless he perceived that by doing so he was preventing an even greater harm.

No reasonable officer could have perceived that David was making any physical preparation to pile drive his daughter into the ground, and the danger that such an act posed to D.H. was therefore not "immediate." *Harris*, 126 F.3d at 1201. Sgt. Dorer stated that he did not perceive David make any move to throw or "pile-drive" D.H. at any particular moment. (Doc. 267, Ex. S. at 44). The videotape further indicates that David took no action that could be reasonably construed as an effort to throw D.H. to the ground. (Pospisil video).

---

[8] The officers were not aware of any information that Officer Antrim claims to have heard but did not broadcast over the radio, such as other alleged threats David made to harm D.H. or statements that David and D.H. were "going down." David's sister-in-law, Sara Hulstedt, stated that David's alleged statements in police reports that he and the baby were "going down" were made to her and Eric over the phone in reference to going down for a nap. (Doc. 313-1, Ex. J at 87). David's actual statements to negotiators were not recorded. Officers were also not aware of David's statements to the negotiators that he planned to hold D.H. over his head when he left the house to prevent officers from shooting him, since he believed that officers would not shoot him if doing so would injure D.H. (Doc. 313-2, Ex. L-2 at 8).

[9] Defendants contend that falling did not cause D.H.'s skull fracture, but do not deny, as the video confirms, that she in fact fell head-first approximately six feet onto a cement surface. (Pospisil video).

1    Instead, David walked slowly up the path, stopped, turned around, and started walking

2    slowly back towards his house. Moreover, Sgt. Dorer was crouched and was aiming his

3    scoped rifle at David's lower back. He had both eyes open so that he, in his own words,

4    could "perceiv[e] with my left eye, everything else" going on at the scene, including the

5    actions of the other officers. (Doc. 266-1, Ex. D at 134:4–5). Had David taken any action that

6    suggested he was about to throw D.H., Sgt. Dorer was in a position to respond immediately.[10]

7    A reasonable officer would have perceived that the only immediate—as opposed to the

8    generalized—threat that David posed to D.H.'s safety was the threat that he would drop her.

9    In addition, as noted above, by firing the officers themselves posed a threat to D.H., the very

10   person they were acting to protect.

11   Reasonable officers in Sgt. Slavin and Sgt. Dorer's positions would have had an

12   interest in using force to protect D.H.'s safety. There was a danger, considering David's

13   erratic behavior, that he could drop or throw D.H., but the video confirms that David never

14   took any action to throw her. (Pospisil video). Moreover, firing at David itself presented an

15   immediate threat to D.H.'s safety that must be taken into account when the *Graham* factors

16   are balanced below.

17

18

19

20   ──────────

21   [10] Plaintiffs allege that Officer Dorer committed an independent Fourth Amendment
     violation by pointing his rifle at David, and therefore is liable for the use of force even if it
22   was reasonable to shoot David when he did. (Doc. 312 at 8). Under this theory, the
     independent Fourth Amendment violation must be, at minimum, "reckless," and must
23   "provoke a violent confrontation." *Billington v. Smith*, 292 F.3d 1177, 1194 (9th Cir. 2002).
     Although David did retreat after Sgt. Dorer pointed his rifle, the videotape confirms that he
24   did so calmly and that he took no action to harm D.H. as he retreated. Therefore, even if Sgt.
     Dorer did not have justification to point his weapon at David, and even if he pointed it
25   recklessly, the act did not "provoke[] a violent confrontation." *Billington*, 292 F.3d at 1194.
26   Accordingly, pointing the gun did not constitute an independent Fourth Amendment violation
     sufficient to render the shooting unjustified if it was otherwise reasonable.
27

28                                        - 21 -

### iii.     Resisting or Attempting to Evade Arrest

David was not resisting the officers or attempting to evade arrest in such a way as to increase significantly the government's interest in using force. The Ninth Circuit has held that a suspect who fled police, but was cornered in a scrapyard, was not fleeing or attempting to escape officers because "in a more precise sense his flight had terminated, at least temporarily, in the scrapyard." *Chew*, 27 F.3d at 1442. In *Smith v. City of Hemet*, the Ninth Circuit found that a suspect had not actively resisted arrest or attempted to flee when he had refused to take his hands out of his pockets, re-entered his house when ordered not to, and refused to submit to being handcuffed, because "it does not appear that [his] resistance was particularly bellicose or that he showed any signs of fleeing the area." 394 F.3d at 703. The Ninth Circuit has recently reiterated that "active resistance is not to be found simply because of a failure to comply with the full extent of an officer's orders." *Nelson*, 2012 WL 2821931, at *9.

David was slowly walking back towards his house while holding D.H. over his head. David's house was surrounded by armed police officers who had instituted a barricade. Of course, David was attempting to leave the front yard where he was exposed, and the government had some interest in keeping him in an exposed area. Defendants claim that David was resisting arrest because he disobeyed orders to put the child down, but do not deny that officers also ordered him to put his hands up, and cannot manufacture non-compliance by giving contradictory orders. (Doc. 268-1, Ex. HH at 2; Doc. 313-1, Ex. B at 56). David's behavior was, if anything, more compliant than that of the suspects in *Chew* and *City of Hemet*. Although the officers had some interest in maintaining David's position in the front yard, he was not actively resisting arrest or attempting to escape sufficient to provide the government with a substantially greater interest in using force against him.

/ / /

/ / /

- 22 -

1

### c.     Balancing of Interests

2

#### i.     Sgt. Dorer

3      Resolving all disputes of fact in his favor, no reasonable officer would have fired

4 when Sgt. Dorer did. The government had an interest in using some force to apprehend David

5 for the crime it alleges he committed. It had an interest in using force to prevent him from

6 dropping D.H. It had some interest in preventing him from entering the house. None of these

7 interests, alone or combined, justified using deadly force. Considering "the facts and

8 circumstances confronting" Sgt. Dorer, it was not reasonable to use deadly force against

9 David to protect D.H. from the mere possibility that he may harm her after returning to the

10 house. *Graham*, 490 U.S. at 396. Any such threat was only speculative and did not present

11 near the immediacy that the law requires. *See Harris*, 126 F.3d at 1201. The only arguable

12 reason to fire—preventing David from throwing D.H. to the ground—cannot justify this

13 shooting because no evidence suggests that David was in "immediate" danger of throwing

14 the girl. *Harris*, 126 F.3d at 1201. Sgt. Dorer perceived no such threat, and as discussed

15 below in conjunction with Officer Slavin, no reasonable officer would have done so.

16      By firing, Sgt. Dorer substituted the purely speculative risk that David would harm

17 D.H. in the house, or that he may throw her, with the certainty that she would fall to the

18 ground and the risk that she herself would be shot. As the Ninth Circuit recently noted in a

19 case where it found officers had violated a man's Fourth Amendment rights by shooting him

20 with a beanbag shotgun to prevent him from injuring himself, "in cases like this one the

21 'solution' could be worse than the problem." *Glenn v. Washington Cty.* 673 F.3d 864, 872

22 (9th Cir. 2011). When the interest in using force is balanced against the fact that by firing,

23 Sgt. Dorer caused the only truly immediate harm that D.H. faced, no reasonable officer

24 would have fired.

25 / / /

26 / / /

27

28

- 23 -

### ii. Sgt. Slavin

Sgt. Slavin also acted unreasonably. Sgt. Slavin provided the following description of what he claimed he saw:

> [H]e had the child above his head, with her back resting on the top of his head. . . . [H]e kinda had his—her—[it] looked like the small of her back right in the center of his head, and that she was kind of slumping over the sides. . . . I immediately yelled to him, "You put that kid down. You put her down." And upon saying that, he pressed her up so that his arms were fully extended, elbows locked out. . . . [I] brought my rifle up, aimed it at him. And at that point, what it appeared to me was that he started to rear back, almost as if he were going to throw her forward. . . . And he—it looked to me like he was about to throw her. And that's the instant I decided to fire.
> (Doc. 269, Ex. PP at 145).

This statement is "utterly discredited" by the video evidence. *Scott*, 550 U.S. at 380. In fact, David held D.H. securely by the torso, with her belly, not her back, facing his head. David had already lifted the child over his head before Sgt. Slavin issued his order to put the child down, so he did not lift the child in response to that order. At no point does David heave her, press out his arms, or make any move to throw her. (Pospisil video). David was holding her securely and steadily and walking away when Sgt. Slavin shot, hitting David once and missing with his other shot. (*Id.*). To the extent that Sgt. Slavin may claim that he was merely mistaken about what he saw, such a mistake was not reasonable given his recent arrival on the scene and the totality of the circumstances. *See Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) ("Not all errors in perception or judgment, however, are reasonable."). A reasonable officer in Sgt. Slavin's position would have perceived exactly what a reasonable officer in Sgt. Dorer's position would have perceived, although from farther away. A reasonable officer in Sgt. Slavin's position would have perceived that shooting David would certainly cause D.H. to fall. Moreover, a reasonable officer in Slavin's position would have perceived that firing at David from nearly ninety feet away presented a risk of hitting D.H.

1   Sgt. Slavin substituted the risk that D.H. would be thrown to the ground with the

2   certainty that she would fall to the ground. He further created a substantial risk that she

3   would be shot, and Defendants have pointed to no place in the record where he took any

4   action to mitigate that risk. Like Sgt. Dorer, Sgt. Slavin's is a case in which "the 'solution'

5   could be worse than the problem." *Glenn*, 673 F.3d at 872.

6                           **iii.    Both Officers**

7   Defendants, relying on a particular definition of "pile drive" for which they offer no

8   support, argued at the hearing that it would have taken no more prepatory movement for

9   David to throw D.H. to the ground than it would have to drop her. (Hearing at 16:52:10–18).

10  This position is simply not reasonable. A reasonable officer would have understood David's

11  earlier threat as a threat to throw D.H. to the ground, and to carry out such a threat David

12  would have had to make some preparatory movements.

13  Defendants contend that a reasonable officer could have perceived that David posed

14  an imminent threat to D.H. sufficient to use deadly force against him merely because he had

15  threatened her earlier and he was holding her in the air. (Hearing at 17:00:01). The previous

16  threat alone, however, could not be reasonably construed as creating an immediate threat

17  twenty minutes later. Officers may consider the impact of previous actions under *Graham*,

18  but the fact that a suspect was previously armed or had previously issued threats is not

19  decisive. *See Robinson v. Solano Cty*. 278 F.3d 1007, 1014 (9th Cir. 2002) (the fact that a

20  suspect had earlier shot neighbor's dog with a shotgun is "insufficient to justify the intrusion

21  on Robinson's personal security"). The Ninth Circuit has found that a detainee's threat to rip

22  out an officer's throat and kill him provided a "lack of provocation" for officers to shove him

23  against a wall minutes later when he struggled under their control. *Cotton v. Cty. of Santa*

24  *Barbara*, 286 Fed. App'x. 402, 404 (9th Cir. 2008). David's earlier threat can be considered

25  part of the totality of the circumstances that Sgt. Dorer perceived, but it did not create an

26  immediate danger that continued for over twenty minutes until David was shot. Were the

27  earlier threat and the fact that David was holding the girl over his head sufficient to justify

28

the use of deadly force, officers could have shot David the moment that he came out of the house. One cannot pay "careful attention to the facts and circumstances of [this] particular case" and still conclude that the officers were free to fire at David and D.H. as soon the negotiators had coaxed him out of his front door. *Graham*, 490 U.S. at 396; (Doc. 313-2, Ex. L-1 at 6).[11]

To the extent that the officers were justified in using some force to protect D.H. from David, they had to consider, among the facts and circumstances confronting them, that when David was holding D.H. above his head, they were sure to harm the very person whose protection authorized the use of force by shooting him. *See Boyd*, 374 F.3d at 779. As noted above, the officers' key interest was protecting D.H., and reasonable officers would have balanced the extent to which they were causing and preventing harm to her before firing. No reasonable officer would ensure that she would be harmed, and risk that she would be killed, in order to protect her, unless by doing so the officer could prevent an immediate risk of even greater harm.[12] The fact that the officers used deadly force in such circumstances only compounds its unreasonableness. Moreover, officers were aware that David was in some sort of mental crisis, and under such circumstances "the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Deorle*, 272 F.3d at 1283.

Even had the shooting been otherwise justified, both officers fired without issuing a warning although such a warning was "feasible," which alone would merit summary

---

[11] David told the negotiators that he planned to hold D.H. over his head when he left the house to prevent officers from shooting him, because D.H would fall and be injured if they did fire. The negotiators did not broadcast this information, so neither Sgt. Dorer nor Sgt. Slavin was aware of it. (Doc. 313-2, Ex. L-2 at 8).

[12] Defendants argue that *Graham* does not require an officer to consider the well-being of bystanders when deciding whether to use force. This claim is addressed during the Court's discussion of qualified immunity below.

judgment in favor of Plaintiffs. *Garner*, 471 U.S. at 12. Even when using a firearm is justified, "whenever practicable, a warning must be given before deadly force is employed." *Harris*, 126 F.3d. at 1201. Defendants have claimed that Sgt. Slavin's order to "put that child down," issued seconds before he shot David, qualified as a warning that he would use deadly force if David did not comply. (Hearing at 17:02:41). The plain language of *Garner* and *Harris*, in addition to clearly established Ninth Circuit law, do not support that argument. As discussed at length above, an order, even when issued by an armed officer, does not constitute a "warning." *Garner*, 471 U.S. at12; *Harris*, 126 F.3d. at 1201; *Lehman*, 228 Fed. App'x. at 700; *Daniels*, 228 Fed. App'x. at 670.

No warning was issued. A warning is not required when it is not "feasible," but the Ninth Circuit has held that this exception "contemplates a narrow class of cases, such as where the suspect has opened fire, or pointed a gun at vulnerable targets." *Idaho v. Horiuchi*, 253 F.3d 359, 372 (9th Cir. 2011), *vacated as moot by Idaho v. Horiuchi*, 266 F.3d 979 (9th Cir. 2001). It has further held that "[v]erbal warnings are not feasible when lives are in immediate danger and every second matters." *Estate of Martinez v. City of Federal Way*, 105 Fed. App'x. 897, 899 (9th Cir. 2004). When a suspect does not pose an immediate threat to the lives of officers or others, a warning is feasible. *See*, *e.g.*, *Penley v. Eslinger*, 605 F.3d 843, 854 n.6 (11th Cir. 2010) (holding that when an officer ordered an armed man to "put down the gun," he did not issue a "warning" under *Garner*, but he was justified in firing because "such a warning might easily have cost the officer his life").

Defendants do not argue that it was not feasible to issue a warning. As noted above, eight seconds before he was shot, David calmly raised D.H. above his head and walked forward, then turned around. He took no sudden action in this period that suggests warning him would not have been feasible or practicable. The officers were in no danger. As discussed above, the video confirms that any danger that David would throw the girl to the ground was not immediate. Both officers shot David in the back without warning him that they were about to use deadly force. Even were the shootings otherwise reasonable, Plaintiffs

1   would be entitled to summary judgment based solely on the fact that the officers used deadly

2   force without issuing warnings.

3         Defendants argue that the case is controlled by *Blanford v. Sacramento Cty.*, 406 F.3d

4   1110 (9th Cir. 2005). In *Blanford*, officers responded to a 9-1-1 call about a man armed with

5   a two-and-a-half foot sword walking through a residential neighborhood. The officers

6   ordered him to drop the sword, and warned him that they would shoot him if he did not. *Id.*

7   at 1116. Instead of dropping the sword, the man turned to the officers, raised the sword, and

8   growled. *Id.* Blanford then tried and failed to enter a house through its front door. When he

9   could not open the door, he turned the corner of the house towards a gate that would have

10   given him access to the house. *Id.* The officers fired at him and struck him, but after he was

11   shot, he continued to flee, escaping through the side gate before he was shot again. *Id.*

12   Blanford again turned away from the officers and into a yard before he was shot a third time.

13   *Id.* When discussing whether Blanford was attempting to escape, the Ninth Circuit wrote that

14   his conduct "manifested a continuing intent to evade [the officers'] authority and enter a

15   private residence" while carrying a dangerous weapon. *Blanford*, 406 F.3d at 1118. The

16   Ninth Circuit found that Blanford was a fleeing felony suspect who "poses a threat of serious

17   physical harm, either to the officer or to others" and that the shooting was justified under

18   *Garner*. *Blanford*, 406 F.3d at 1115 (quoting *Garner*, 471 U.S. at 11). David was

19   substantially less resistant to the police than *Blanford*, and police were aware that he was

20   walking towards his own unoccupied home. The officers in *Blanford* issued "warnings that

21   they would shoot if he did not comply." *Blanford*, 406 F.3d at 1116. Moreover, nothing in

22   *Blanford* suggests that the officers posed a harm to third parties or brought about the harm

23   they were seeking to prevent by firing, as did the officers here.

24         The Ninth Circuit has written that summary judgment is rare in cases of police

25   misconduct, because "police misconduct cases *almost* always turn on a jury's credibility

26   determinations." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (emphasis added). This

27   case is an exception to that general caution. Almost everything the officers heard was

28

1   recorded and transcribed, and the shooting itself was recorded on video. The officers fired

2   at an unarmed man who was walking away from them. Although he had issued threats

3   against D.H. earlier, nothing he did after walking outside would suggest to a reasonable

4   officer that he was placing D.H. in imminent danger of suffering any more harm than falling

5   to the ground. By shooting David, the officers caused the very harm that a reasonable officer

6   could believe that David posed to D.H. Considering "the totality of the facts and

7   circumstances in the particular case," no reasonable officer could have believed that shooting

8   David without warning, while he calmly walked back towards his house with D.H. over his

9   head, was a proper means of protecting D.H.'s safety. *Blanford*, 406 F.3d at 1115.

10                        **d.      Disputed Issues of Fact**

11          The parties dispute whether David lifted D.H. over his head in response to officers'

12   commands to put his hands up. Sgt. Smith stated that he heard officers tell David to put his

13   hands up, but is imprecise about the timing of the orders. (Doc. 268-1, HH at 3). A witness,

14   McKenzie Gilles, told an interviewer that she heard officers order "put your hands up"

15   immediately before the shooting. (Doc. 317-1, Ex. FFF-1 at 15).[13] Any reasonable officer

16   who heard other officers commanding David to raise his arms could have concluded that

17   David was complying with that command when he lifted D.H. over his head.

18          Second, the parties dispute whether it was feasible to Taser David or seek to

19   physically restrain him rather than shoot him. According to Officer Fellow's placement of

20   officers equipped with Tasers on a diagram of the house at his deposition, one was within 20

21   feet of David as he walked forward out of the house before turning around, and another was

22   slightly closer. (Doc. 266-2, Ex. E, Ex. 229). The effective outer range of a Taser is 25 feet,

23

24

25

26          ───────────────

27          [13] The audio confirms that Sgt. Slavin shouted "Put that child down" just before
     shooting. All parties acknowledge, however, that multiple officers were giving commands.

28                                    - 29 -

though the preferred range is under 15 feet.[14] (Doc. 313-2, Ex. EEE). Sgt. Smith stated that he did not use his Taser because he was concerned that David would thereby drop and injure D.H. (Doc. 268, Ex. GG at 20).[15] Sgt. Dorer and Sgt. Slavin did not have access to less-than-lethal force themselves. The Ninth Circuit has held that Tasers constitute "an intermediate, significant level of force," but they may be deployed with a significantly lower government interest than firearms. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

Because even if these two facts were resolved by a jury in favor of the Defendants, they would not have rendered the shooting reasonable given the other facts that are not in dispute, neither of them prevents summary judgment in Plaintiffs' favor. *See Anderson,* 477 U.S. at 248. They are, however, sufficient to defeat Defendants' summary judgment motion. In considering the Defendants' motion, the Court would have to find both of these issues in Plaintiffs' favor. In so finding, it would consider whether reasonable officers would have shot David in the back while he walked away from them after complying with their orders to put his hands up, while officers stood ready and able to use less-than-lethal force. No reasonable officer would use deadly force to protect D.H.'s safety in such circumstances.

### e.     Qualified Immunity

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Decisions subsequent to *Harlow* have clarified that whether a

---

[14] In a recent case in which the Ninth Circuit established that using a Taser constitutes an intermediate level of force, an officer had successfully used a Taser against a civilian standing "twenty to twenty-five feet away." *Bryan v. MacPherson*, 630 F.3d 805, 822 (9th Cir. 2010).

[15] Officer Smith also stated, when prodded, that he did not believe he was close enough to Taser David, but does not state how far away he was. (Doc. 268, Ex. GGG at 20). According to Officer Fellows's diagram, Officer Smith was within 20 feet. (Doc. 266-2, Ex. E, Ex. 229).

reasonable officer should have known of a right in a particular factual context depends solely and objectively on whether a principle of law had been "clearly established at the time" the officers took the contested action. *Pearson*, 555 U.S. at 244.

Before determining whether a particular right has been clearly established, a court must first define that right specifically, rather than relying merely on the broad strokes of *Garner* and *Graham*. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A court cannot "find fair warning in the general test set out in *Graham* and *Garner*" that a right was "clearly established in this more particularized" sense without examining the facts closely. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). Once the right is defined, an officer may only be denied qualified immunity if relevant cases demonstrate that the applicable principles of law were clearly established at the time of the incident. To determine whether a properly defined right has been clearly established, courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). *See also Anderson*, 483 U.S. at 640 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.").

In the Ninth Circuit, a court looks first to Supreme Court precedent, and then to Ninth Circuit caselaw to find whether a principle has been clearly established. If those sources are not decisive, a court may turn to "whatever decisional law is available to ascertain whether the law is clearly established." *Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir. 1985) (considering out-of-circuit cases, including district court and state court cases from other circuits, to conclude that a right was clearly established in the absence of Ninth Circuit precedent). In fact, "[e]ven unpublished decisions of district courts may inform our qualified immunity analysis." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (2003) (quoting *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002)). A court may not, of

course, pick and choose from among authorities that disagree on a principle to find that it has been clearly established; in the absence of controlling authority, the court may consider only a "consensus of cases of persuasive authority." *al-Kidd*, 131 S. Ct. at 2084 (quoting *Wilson*, 526 U.S. at 617).[16] If a principle of law had been "clearly established" by the Supreme Court, the Ninth Circuit, or a consensus of persuasive authority at the time of the incident, it has been clearly established. *Id.*

At the hearing, Defendants argued that Sgt. Dorer and Sgt. Slavin would be protected by qualified immunity on a number of issues. First, they argued that a reasonable officer could interpret *Blanford* to believe that David was creating a risk of harm to D.H. sufficient to justify the use of deadly force. (Hearing at 17:04:00). Next, they argued that *Graham* does not in fact require an officer to consider whether the use of deadly force may harm third parties, and that even if it did a reasonable officer could mistakenly think that it does not so require. (Hearing at 17:11:05). Finally, they argued that a reasonable officer could believe that issuing an order while holding a firearm qualifies as a "warning" under *Garner*. (Hearing at 17:03:12).[17] These points will be discussed in turn.

### i.     The Use of Deadly Force

Defendants argued at the hearing that the case was controlled by *Blanford*, and that

---

[16] In *al-Kidd*, the Supreme Court held that a principle had not been clearly established when the only authority for it was found "in a footnoted dictum devoid of supporting citation," in an-out-of-circuit district court case. 131 S. Ct. at 2083.

[17] Defendants do not contest that consideration of a suspect's mental state, consideration of whether less-than-lethal force is available, or the need for a warning were clearly established as part of the *Graham* analysis on the date of the shooting, as indeed they were. *See Deorle*, 272 F.3d at 1283 ("[T]he governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual"); *City of Hemet*, 394 F.3d 689 (holding that under *Graham* officers must consider "the availability of alternative methods of capturing or subduing a suspect"); *Garner*, 471 U.S. at 11–12. (holding that deadly force is only justified "if, where feasible, some warning has been given").

even if *Blanford* did not control the outcome, it does provide officers with qualified immunity. (Hearing at 17:04:28). The government's interest in using force in *Blanford* was significantly higher than the government's interest in using force here because "Blanford was armed with a dangerous weapon, was told to stop and drop it, was warned that he would be shot if he didn't comply, appeared to flaunt the deputies' commands by rasing the sword and grunting, refused to let go of the sword, and was intent upon trying to get inside a private residence or its backyard with the sword in hand." *Blanford*, 406 F.3d at 1119. The court concluded that "the deputies had cause to believe that Blanford posed a serious danger to themselves and to anyone in the house or yard that he was intent upon accessing, because he failed to heed warnings or commands and was armed with an edged weapon that he refused to put down." *Id.* at 1116. As discussed above, there was some danger that David may drop D.H., but at the time he was shot he did nothing to suggest an immediate danger that he would throw her to the ground. Furthermore, David was not armed, was not evading the police as was Blanford, and was not warned that he would be shot if he did not comply with the officers' commands. The principle that officers may not fire at a non-fleeing suspect unless he poses an "immediate threat to the officer or others" was clearly established in 1997. *Harris*, 126 F.3d at 1201.[18]

### ii.    Harm to Third Parties

Defendants were notified that parties would be asked at the hearing "to discuss whether officers must consider the risk of harm using force presents to third parties under a *Graham* analysis." (Doc. 339). At the hearing, Defendants argued that, under *Graham*, officers need not consider whether using force will harm the person that the government is trying to protect, citing as authority *United States v. Padilla*, 508 U.S. 77 (1993) (Hearing

---

[18] *Harris* is cited favorably in *Blanford*, which does not purport to limit its holding in any way. *Blanford*, 406 F.3d at 1117. ("Unlike the FBI agent in *Harris*, the deputies here knew that Blanford was armed with an edged sword that he refused to drop despite orders to do so and despite warnings that he would be shot if he did not.").

at 16:52:52). *Padilla* is not a force case and does not cite *Graham*. In it, the Court found that evidence may not be suppressed because it was obtained by violating the Fourth Amendment right to be free from unreasonable searches of someone other than the defendant. *Id.* at 82 ("The case is remanded so that the court may consider whether each respondent had either a property interest protected by the Fourth Amendment that was interfered with by the stop of the automobile driven by Arciniega, or a reasonable expectation of privacy that was invaded by the search thereof."). Defendants have cited no case for the proposition that allegations of excessive force under *Graham* are to be judged by the standards set forth for the application of the exclusionary rule. Nor does the rationale that underlies exceptions to the exclusionary rule have any application to the excessive force context—in excessive force cases, courts look to the officers' actions objectively and decide whether they were "reasonable in light of the facts and circumstances confronting them." *Graham* 490 U.S. at 396. Thus, it would be wholly inappropriate in an excessive force context to discount the need to protect persons on the scene.

The question at issue is whether it was clearly established, before November 7, 2008, that before using force officers had to consider whether that force could harm parties other than the intended targets. As discussed below, cases from the Ninth Circuit and elsewhere had clearly established this principle at this time. Indeed, it is difficult to see how the *Graham* test could fail to include consideration of harm to third parties. If Sgt. Slavin and Sgt. Dorer were not required to consider D.H.'s safety in any way when they were using force against David precisely to protect D.H., and if deadly force were indeed justified, they could have used force that would have killed D.H. (or others) and not violated the Fourth Amendment. Such a result does not square with the reasonableness requirement of *Graham*.

In *Boyd v. Benton Cty.*, 374 F.3d 773 (9th Cir. 2004), officers were investigating an armed robbery in which a .357 magnum and a substantial amount of jewelry were stolen. After apprehending one suspect, who was armed when police caught him, officers obtained a search warrant for an apartment where the other suspect was known to live with up to seven

people. Knowing that the apartment included a loft area where a shooter could have targeted the officers if they entered through the door, the police department opted to gain entry by throwing an incendiary device, known as a "flash-bang" grenade, into the apartment. The Ninth Circuit held that the force was unreasonable because the officers had failed to consider that the explosion could injure unidentified residents of the apartment not connected to the criminal activity. The Ninth Circuit held that the Fourth Amendment prohibited officers from throwing the device "into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury." *Boyd* 374 F.3d at 779.[19]

In *Haugen v. Brosseau*, 339 F.3d 857, 861 (9th Cir. 2003) (overturned on qualified immunity grounds by *Brosseau v. Haugen*, 543 U.S. 194 (2004)), the Ninth Circuit denied qualified immunity to a police officer who shot a dangerous felon in the back as he fled in a jeep. The Supreme Court reversed the Ninth Circuit on the question of qualified immunity on the grounds that the law was not clearly established at the time of the incident, but did not disturb the conclusion that the officer violated the Fourth Amendment. *Brosseau*, 543 U.S. at 198. ("We express no view as to the correctness of the Court of Appeals' decision on the constitutional question itself."). The Ninth Circuit's holding that the officer violated Brosseau's Fourth Amendment rights remains good law and served to clearly establish, for the purposes of qualified immunity, that similar shootings violate the Fourth Amendment. The officer had stated that part of the reason she shot the man was to protect pedestrians in front of the jeep. The officer stated that she was "'aware of the background exposure,' but she nonetheless believed she had a safe shot because she thought the bullet would be stopped by the Jeep's engine block before reaching the bystanders." *Haugen v. Brosseau*, 351 F.3d 372, 379 (9th Cir. 2003). The Ninth Circuit found that the threat posed by the man did not

---

[19] The Ninth Circuit held that the officers in *Boyd* were protected by qualified immunity, but the case itself serves to clearly establish the law as of 2004.

justify using deadly force. In doing so, it acknowledged that harm to bystanders was part of the calculus, noting that the officer did not fire again "because she thought the risk [of hitting a bystander] became too great as [the driver] began to drive away." *Id.*

Other district courts in the Ninth Circuit have held that it was clearly established prior to 2008 that *Graham* requires consideration of whether the use of force may cause harm to those who are not targets of the force. Although these cases were decided after 2008, they involved incidents occurring prior to 2008, and therefore demonstrate that other district courts have determined that the principle was clearly established in the Ninth Circuit prior to this incident. In *Bailey v. Cty. of San Joaquin*, 671 F. Supp. 2d 1167, 1173 (E. D. Cal. 2009) the court held that an officer had used excessive force if, when he fired into a house, he "had reason to believe a child was in the house" and "could not predict . . . who might be injured." It found that *Boyd* clearly established the principle that the officer had to consider the safety of all the civilians, and denied qualified immunity. *Id.* at 1174. In *Dietzmann v. City of Homer*, CV-09-00019 (RJB), 2010 WL 4684043, at *15 (D. Alaska Nov. 17, 2010), officers fired their weapons at a man in a car who had drawn a weapon on them. The court found that the officers were required, under *Graham*, to consider the fact that shooting the man may injure or kill one of the man's two children who were sitting in carseats in the rear of the vehicle.[20] It held that while the government had shown it had an interest in

---

[20] Defendants are correct to point out that in *Dietzmann* the children in the vehicle were bringing a claim on their own behalf. The court in *Dietzmann* found that there were genuine issues of material fact as to whether the children themselves had been "seized" under the Fourth Amendment. Nevertheless, when considering whether the shooting was objectively reasonable under *Graham*, the court did not suggest that the children were the targets, and that the shooting was only reasonable if the officers were reasonable in using excessive force against them. It considered instead whether objectively reasonable officers, in shooting the driver, ought to have considered the fact that the children were thereby put in harm's way. *See Deitzmann*, 2010 WL 4684043, at *15 ("There are issues of fact as to whether the government's need to apprehend *Anderson* at that moment was outweighed by the *great risk posed to the children and others*.") (emphasis added). Although *Dietzmann* found in this context that the firing presented issues of fact, the cases uniformly suggest that

apprehending the suspect, there remained "issues of fact as to whether the government's need to apprehend Anderson at that moment was outweighed by the great risk posed to the children and others" by such a shooting. *Id.* at *15. Although the court acknowledged that the suspect's crime was severe, it held that the risk posed to the children by firing had to be considered when assessing whether firing was reasonable.

Other circuits routinely considered the harm officers may inflict on those other than the target of the force during a *Graham* analysis prior to 2008. The Eleventh Circuit has directly held that when officers use force in a way that brings about the very harm they have an interest in preventing under *Graham*, they violate the Fourth Amendment rights of the target of the force. In *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003), officers responded to reports that a truck had been stolen. They located the truck and a high-speed chase ensued. The officers fired into the cabin of the vehicle and injured the occupants; the driver lost control of the vehicle and it crashed. The court wrote that the high-speed chase presented a danger to the public, and that "a reasonable officer would have known that firing into the cabin of a pickup truck, traveling at approximately 80 miles per hour on Interstate 85 in the morning, would transform the risk of an accident on the highway into a virtual certainty." *Id.* at 1333. *See also Torres v. Cruz*, CV-90-346 (JBS), 1995 WL 373006 (D. N. J. Aug. 24, 1992) (holding that under *Graham*, firing a warning shot is objectively unreasonable because the officer who fired "endangered the plaintiff, Lopez, *and others* by engaging in this very risky behavior") (emphasis added).

It is true that in a number of cases in which officers have injured people other than their intended target—usually hostages—courts have found that the officers did not violate the constitution. *See Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990) (officers did not violate the constitution when they shot at an armed robber and struck a man

---

when the facts are not in dispute, the reasonableness issue in most circumstances is to be determined by the court.

1   who was being used as a human shield); *Stroik v. Ponseti*, 35 F.3d 155 (1994) (police did not

2   violate the constitution when they shot at a carjacker and struck a woman he was holding

3   hostage). *See Landol-Rivera*, 906 F.2d at 796. In such cases, however, courts consider

4   whether the officers paid adequate attention to the safety of the hostage. The government's

5   interest in using force against the hostage-taker may be so extreme that it outweighs the

6   danger to the hostage—for example, if the hostage-taker is firing or threatening to fire a

7   weapon at the police. *See Stroik*, 35 F.3d at 159 (finding such a shooting constitutional

8   because when the officer fired, it was undisputed that the hostage-taker "was pointing a gun

9   at him.").[21] No party asserts such circumstances presented themselves here. To the extent that

10  the hostage cases are relevant to a *Graham* analysis, they too require that officers consider

11  the safety of non-targets when using deadly force.

12        Together, these cases stand for the uncontroversial proposition that the Supreme Court

13  meant what it wrote in *Graham*: officers must consider "the facts and circumstances

14  confronting" them before using force. 490 U.S. at 396. Officers must consider whether the

15  circumstances justify imposing a risk of harm on innocent third parties. *Boyd*, 374 F.3d at

16  779. Further, officers must consider whether using force will transform the risk of harm they

17  seek to prevent "into a virtual certainty." *Vaughan*, 343 F.3d at 1333. Finally, if the protected

18  interest is "outweighed by the great risk to . . . others" presented by shooting, then using

19  deadly force is not reasonable. *Deitzmann*, 2010 WL 4684043, at *15. The need to consider

20  the risk to third parties during the third step of the *Graham* test was "clearly established in

21  this more particularized" sense before November of 2008. *Brosseau*, 543 U.S. at 199.

22

23        [21] Claims raised by hostage-victims solely on their own behalf often do not arise under
    the Fourth Amendment, because a person is not necessarily "seized" when the police are not
24  intending to shoot him. *See Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989) (Fourth
    Amendment seizure only takes place when "there is a governmental termination of freedom
25  of movement *through means intentionally applied*") (emphasis in original). Claims by the
    struck hostage are instead analyzed under the standards of the Fourteenth Amendment.
26  D.H.'s Fourteenth Amendment claim has already been dismissed and is not at issue in this
    analysis. (Doc. 182 at 8–10).
27

28                                          - 38 -

1

### iii.   Issuing a Warning

2   As noted above, it has long been clearly established that the warning required before

3   using force is a "warning of the imminent use of such a significant degree of force." *Deorle*,

4   272 F.3d at 1285. An officer may shoot a person armed with a deadly weapon without

5   warning when such a warning is not feasible, but the order to put D.H. down was not itself

6   a warning. In addition to *Deorle*, both of the Ninth Circuit cases cited above in support of

7   this principle predated the shooting. *See Deorle*, 272 F.3d at 1285, *Harris*, 126 F.3d. at 1201,

8   *Garner*, 471 U.S. at 12; *see also Lehman*, 228 Fed. App'x. at 699; *Daniels*, 228 Fed. App'x.

9   at 670.[22]

10   Whether any mistake that such orders constituted a warning is "reasonable" under

11   some subjective standard is simply not a relevant inquiry for the purposes of qualified

12   immunity. The law of the Ninth Circuit had clearly established by November of 2008 that

13   such a command was not a warning under *Garner*, and the Ninth Circuit had long held that

14   actual warnings are required. *See Harris*, 126 F.3d at 1201.

15   The officers are therefore not entitled to qualified immunity on claim one, and

16   summary judgment on the question of liability is entered on behalf of the Plaintiffs.

17   ### B.   Claim Two: Fourth Amendment (Excessive Force)—Officer Fellows, Officer Garcia, Sgt. Dorer and Sgt. Slavin

18

19   Sgt. Dorer ordered Officers Fellows and Garcia to handcuff David after he was shot,

20   which they did. Sgt. Slavin ordered the officers to "drag" David nearly four hundred feet to

21

22   [22] As noted above, these unpublished cases are relevant to the qualified immunity

23   analysis because "[e]ven unpublished decisions of district courts," let alone unpublished circuit court decisions, "may inform our qualified immunity analysis." *Drummond*, 343 F.3d

24   1060 (2003). In any event, *Deorle* is a published opinion, and this Court has found no case where the Ninth Circuit has construed an order to comply with commands as adequate

25   warning of the use of deadly force under *Garner*. *See*, *e.g.*, *Blanford*, 406 F.3d at 1116

26   (noting that the officers warned "that they would shoot if [Blanford] did not comply" with orders to drop the sword). To the extent that *Lehman* and *Daniels* are not controlling

27   authority, combined with *Garner*, *Harris*, and *Deorle*, they make up a "consensus of cases of persuasive authority." *al-Kidd*, 131 S. Ct. at 2084.

28

the paramedics, which they also did. The officers dragged David face-down, with his knees exposed to the abrasive gravel and asphalt. As a result, David suffered "gaping wounds" to his kneecaps. Plaintiffs allege that both the handcuffing and the dragging constituted excessive force under the Fourth Amendment. (Doc. 28 ¶ 254–258). The supervisory liability of Sgt. Dorer and Sgt. Slavin will be addressed in the general section on supervisory responsibility below.

### 1.   Handcuffing

According to Officer Fellows, David was handcuffed in order to eliminate the potential for him "to use his physical weapons against us, if that was what he so decided," and confirmed that by "weapons" he meant David's hands. (Doc. 266-2, Ex. E-18 at 123). The Ninth Circuit has held that officers can be liable, and can be denied qualified immunity, for forcibly handcuffing in a circumstance where, because a plaintiff merely "'passively resisted' the handcuffing, . . . the need for force, if any, was minimal at best." *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003). A reasonable jury here could find that the need for force was minimal. However, it is not clear from the video, or from any testimony by Plaintiffs, that "the type and amount of force inflicted" from the handcuffing alone was anything other than minimal. *Espinosa*, 598 F.3d at 537. Plaintiffs make no allegation that the handcuffs were tight enough to cause injury on their own, or that David suffered an injury to his wrists because of the handcuffs, as was the case in *Meredith*. Defendants had probable cause to arrest David, and handcuffing is a regular procedure during an arrest. There is no material issue of fact as to whether the handcuffing was itself legitimate, and no allegation that the handcuffing was conducted in a manner that constituted excessive force. Defendants are granted summary judgment on the handcuffing allegation in Claim Two.

### 2.   Dragging

#### a.   Merits

A claim that law enforcement officers used excessive force "in the course of transporting an arrestee gives rise to a section 1983 claim based upon a violation of the

Fourth Amendment." *Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir. 1985). Whether the dragging was reasonable, therefore, once again requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. The Ninth Circuit has cautioned that in determining the government interest in using force against a person already in police custody, "it is clear that all the factors mentioned in *Graham*—whether the suspect is resisting arrest or attempting to flee, for example—will not necessarily be relevant." *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1197 (9th Cir. 2002).

The type of force used here is again not in dispute. Officer Fellows and Officer Garcia dragged David in a forward-facing position so that his knees were in contact with the asphalt for nearly 400 feet as they brought him to an ambulance. (Pospisil video). The government interest that gave rise to the use of force was an interest in treating David for his gunshot injuries as quickly as possible—in other words, an interest in David's safety and well-being.

Defendants argue that Fellows and Garcia were not aware they were injuring David. When officers are mistaken or are unaware of the force they are using on a person in custody, "the relevant inquiry was weather the officer's mistake . . . was objectively unreasonable." *Torres v. City of Madera*, 524 F.3d 1053, 1056 (2008). In *Johnson v. Cty. of Los Angeles*, 340 F.3d 787 (9th Cir. 2003), sheriff's deputies caused a suspect serious injury in the course of extracting a suspect from his car after a high-speed chase. The Ninth Circuit found that the force the officers used—pulling and twisting—was reasonable, and that the officers could not be liable for the unforeseeable consequences of that reasonable force.

"Where an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (emphasis in original). In *Torres*, the Ninth Circuit found that an officer who had drawn her firearm when she meant to draw her Taser was not entitled to summary judgment because a jury could find the mistake unreasonable given the fact that the officer had done so before, and had been

undergoing daily training to avoid repeating the error. *Torres*, 648 F.3d at 1127. *See also Jensen v. City of Oxnard*, 145 F.3d 1078, 1083 (9th Cir. 1998) (officer violated Fourth Amendment when he unreasonably mistook a fellow officer for a criminal suspect and shot him).

*Torres* suggests that the question of whether an officer's mistake of fact is reasonable, even when objective facts as to the officer's actions are not in dispute, is a question for the jury. In the particular circumstance of drawing a handgun instead of a Taser, the Ninth Circuit identified the following five factors to be weighed in considering whether a mistake of fact is reasonable:

> (1) the nature of the training the officer had received to prevent incidents like this from happening; (2) whether the officer acted in accordance with that training; (3) whether following that training would have alerted the officer that [s]he was holding a handgun; (4) whether the defendant's conduct heightened the officer's sense of danger; and (5) whether the defendant's conduct caused the officer to act with undue haste and inconsistently with that training.

*Torres*, 648 F.3d at 1125. All of these except factor three are relevant to whether the officers' mistake here was reasonable.

The medical emergency justified acting in haste, but Officer Fellows acknowledged that he knew that David's knees were in contact with the ground, and that dragging a person so that his knees are in contact with the ground will cause injury. (*See* Doc. 266-2, Ex. E at 131:9–132:19). He stated that he did not consider whether David was being injured because "[t]he only thing I was thinking about was expediting him to medical attention." (Doc. 266-2 at 132:23–24). The Arizona Peace Officer Standards and Training ("AZ-POST") recommends transporting prisoners who have to be dagged face-up, with their heels, rather than their knees, touching the ground. (Doc. 316-2, Ex. NN). Defendants' contention that "Hulstedt . . . gave no indication that he was being harmed by the manner in which he was moved" is irrelevant. (Doc. 329 at 8). Presumably, David failed to complain about the damage to his kneecaps because his spinal cord had been severed when he was shot in the

1   back, thus rendering him unable to feel the pain associated with his injury.

2     Considering all of the relevant factors, "a reasonable jury could weigh the

3   significance" of the officers' training and the other circumstances and find either that their

4   mistake was reasonable or that it was not.  *Torres*, 648 F.3d at 1125. In doing so, the jury

5   would be instructed that "whether the mistake was an *honest* one is not the concern, only

6   whether it was a *reasonable* one." *Torres*, 648 F.3d at 1127 (emphasis in original). Summary

7   judgment will be denied to both parties on the dragging claim within Count Two.

8   **b.**  **Qualified Immunity**

9     Even if the officers violated David's Fourth Amendment rights, they would entitled

10  to summary judgment if they did not violate law that was clearly established to a sufficiently

11  particular degree at the time of the incident. *Pearson*, 555 U.S. at 236. Another court in this

12  district had found, prior to this incident, that dragging a prisoner so that the prisoner's knees

13  were in contact with asphalt can violate the Fourth Amendment. *Burnett v. Bottoms*, 368 F.

14  Supp. 2d 1033, 1041 (D. Ariz. 2005) (Finding that a plaintiff stated a claim for excessive

15  force when she alleged that after she was handcuffed officers "dragged Plaintiff on her knees

16  across the asphalt pavement to the police car"). It was clearly established as early as 2003,

17  moreover, that officers who use excessive force against a prisoner while awaiting medical

18  care can violate the Fourth Amendment. *See Drummond*, 343 F.3d at 1059 (officers liable

19  for sitting on the chest of a handcuffed prisoner in a manner likely to cause "compression

20  asphyxia" while waiting for ambulance). The principle that officers do not violate the Fourth

21  Amendment when they make reasonable mistakes has long been clearly established. *See*

22  *Maryland v. Garrison*, 480 U.S. 79 at 94 (1987) ("[I]f, in light of the officers actual or

23  imputed knowledge, their behavior was reasonable, then their mistakes did not constitute an

24  infringement on respondent's Fourth Amendment rights."). Likewise, however, the principle

25  that an unreasonable mistake does not excuse a Fourth Amendment violation had been

26  clearly established before the incident. *See Jensen*, 145 F.3d at 1083. ("The allegation that

27  Sergeant Christian, by intentionally shooting at a figure he mistook to be an armed criminal,

28  - 43 -

1   engaged in a Fourth Amendment violation seizure is supported in the law."). If a jury were

2   to find that the officers' mistake was unreasonable, they would not be entitled to qualified

3   immunity.

4          Summary Judgment is denied to both parties Claim Two.

5          **C.     Claim Seven: Fourth Amendment (home searches)—multiple officers**

6          The remaining allegations in Claim Seven are that three separate searches were

7   unconstitutional under the Fourth Amendment, namely, two warrantless entries made

8   immediately after the shooting and a search conducted pursuant to a warrant later that night.

9   (Doc. 28 ¶¶ 290–301). Plaintiffs have moved for summary judgment regarding the two

10  warrantless entries, and Defendants have moved for summary judgment regarding the

11  warrant.

12                      **1.     Warrantless Entries**

13         The Fourth Amendment requires that officers obtain a warrant before searching a

14  home "unless the exigencies of the situation make the needs of law enforcement so

15  compelling that the warrantless search is objectively reasonable." *Mincey v. Arizona*, 437

16  U.S. 385, 393–94 (1978) (internal quotation omitted). Officers may enter a home without a

17  warrant "to render emergency assistance to an injured occupant or to protect an occupant

18  from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). To

19  determine whether an emergency entry was justified, a court asks whether "(1) considering

20  the totality of the circumstances, law enforcement had an objectively reasonable basis for

21  concluding that there was an immediate need to protect others or themselves from serious

22  harm; and (2) the search's scope and manner were reasonable to meet the need." *U.S. v.*

23  *Snipe*, 515 F.3d 947, 952 (9th Cir. 2008).

24                      **a.     Initial Sweep**

25         Less than a minute after David was shot, Sgt. Dorer stated "we'll clear the house."

26  (Doc. 313-1, Ex. B at 57). Fewer than four minutes later, Sgt. Slavin radioed that the

27

28                                    - 44 -

1  "residence is clear." (*Id.* at 58).[23] Defendants claim that the initial sweep of the house was

2  conducted "to determine if anyone, other than D.H., was harmed inside the house; if and how

3  D.H. was harmed inside the house; and to make sure that nothing in the home would present

4  a danger to themselves or others, upon re-entry." (Doc. 319 at 11). They further claim that

5  because shots had been fired at the house, it was reasonable to enter and make sure that no

6  one inside was injured by the gunfire. (*Id.*).

7     According to *Brigham City*, officers must have "*an objectively reasonable basis* for

8  believing that an occupant is seriously injured or imminently threatened with such injury"

9  before entering to render emergency aid. 547 U.S. at 400 (emphasis added). In their

10  Controverting Statement of Facts, Defendants did not dispute, for the purposes of this

11  motion, that "Dorer's information was that D.H and David were the only people inside the

12  house." (Doc. 320 at 66:24–67:1). Throughout the SPD radio communications, there was

13  never any suggestion that anyone was in the house besides David and D.H. after David's

14  parents left. At 12:34, Sgt. Stumpf ordered Officer Hertko to get everyone except for David

15  and D.H. out of the house, and Officer Hertko responded over the radio that "the house

16  should be empty aside from our suspect and the daughter." (Doc. 313-1, Ex. B at 19). When

17  he was interviewed on the day of the shooting, Sgt. Dorer stated that he "knew at that point

18  while I was still en route that the suspect . . . was in the house by himself with the child."

19  (Doc. 266-6, Ex. R. at 165). Sgt. Dorer had no objectively reasonable basis to believe that

20  there was anyone in the house at all once David and D.H. had left, let alone that they were

21  injured, and the sweep therefore cannot be justified under the "emergency assistance"

22  doctrine. *Brigham City*, 547 U.S. at 403.

23     Defendants claim alternately that the first sweep was justified because the officers

24  were looking for information about D.H.'s injuries in order to assist with her treatment.

25

---

26  [23] At the hearing, Defendants represented that Sgt. Slavin had ordered the sweep of

27  the house. (Hearing at 17:07:05). It appears from the record that while Sgt. Slavin conducted the search, Sgt. Dorer ordered it, as Plaintiffs do not dispute. (Doc. 320 at 66:24–67:1).

28                                     - 45 -

While David was in the house, Sgt. Dorer and his team were actively monitoring the situation, and he later stated that "if we got any indication that he was hurting the child we would force entry and go do a crisis rescue." (Doc. 267 at 19). The team did not enter and do a crisis rescue. After David was shot, Sgt. Dorer himself stated over the radio that "the child is okay." (Doc. 313-1, Ex. B at 57). Officer Greene's statement that D.H. appeared to have been injured when David took her out of the house was only broadcast at 2:10 pm., after the sweep was concluded. (*Id.* at 60). When Sgt. Dorer entered the house, emergency assistance was already being rendered to D.H., who in Sgt. Dorer's words was "en route back to command for medical attention." (*Id.* at 57). Defendants provide no evidence either to suggest that at the time he ordered the sweep, Sgt. Dorer had any reason to believe that D.H. was injured inside the house or that sweeping the house would provide any information relevant to treating that injury.

### b.    Second Sweep

Sgt. Marmie and Sgt. Smith both state that they conducted a subsequent sweep to look for medication in plain view that may have been previously administered to D.H. (Doc. 272-1, Exs. M, O). They had heard over the radio that the child was "okay," and receiving medical treatment, so they had no reason on their own to enter the house. (Doc. 313-1, Ex. B at 57). Both state that they believe a paramedic had asked an SPD officer to look for such medication, but neither remembered the paramedic's name, or even if they spoke directly to the paramedic or not. (*Id.*). Defendants have provided no evidence that any medical officer requested that officers search the house to look for medication or for any other reason. Absent such evidence, Sgt. Marmie's and Sgt. Smith's statements about what unnamed paramedics told them constitute inadmissible hearsay and cannot form the basis of a denial of summary judgment. *Harkins Amusement Enters., Inc. v. General Cinema Corp.*, 850 F.2d 477, 490 (9th Cir. 1988), *cert. denied*, 488 U.S. 1019 (1989) (quoting *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 667 (9th Cir. 1980)).

1

### c.   Qualified Immunity for Warrantless Entries

2    Neither sweep was justified under the Fourth Amendment, under the emergency

3   assistance doctrine or otherwise. Nevertheless, the Court must grant the officers qualified

4   immunity if "reasonable police officers in [the officers'] position could have come to the

5   conclusion that the Fourth Amendment permitted them to enter," which they could have done

6   "if there was an objectively reasonable basis for fearing that violence was imminent." *Ryburn*

7   *v. Huff*, 132 S. Ct. 987, 992 (2012). In *Ryburn*, the Supreme Court granted officers qualified

8   immunity when they followed a woman into her house after she ran inside when they asked

9   her if there were guns in the house. Finding that the woman's actions could have provided

10   the officers with "a reasonable basis for concluding that there is an imminent threat of

11   violence," it found that an officer could reasonably interpret *Brigham City* to allow for

12   emergency entry to counter that threat. Here, there is no evidence that the officers believed

13   that there was anyone in the house to assist—in fact the evidence demonstrates that during

14   both entries the officers knew the house to be unoccupied. The officers are not entitled to

15   qualified immunity for the searches.

16

### 2.   Search Warrant

17    Plaintiffs claim that the search warrant authorizing a search on the evening of

18   November 7 was obtained by judicial deception. (Doc. 312 at 23–27). A warrant has been

19   obtained by judicial deception when (1) a supporting affidavit "contained reckless or

20   deliberate false statements and omissions" and (2) "the affidavit, once corrected and

21   supplemented, would not have provided a magistrate judge with a substantial basis for

22   finding probable cause." *Chism v. Washington State*, 661 F.3d 380, 388–89 (9th Cir. 2011)

23   (internal citations omitted). Here, Det. Lockerby's affidavit contained a number of inaccurate

24   statements, including that Walter and Janice had asked for police assistance, that David's

25   wife Rachel "was the wife of [D.H.]" (the child), and that David stated he had already injured

26   his daughter. (Doc. 318-4, Ex. FFFF at 9). In addition, the affidavit contained the following

27   statement: "It was also observed Officers [*sic*] that there was blood coming out of [D.H.]'s

28

ear." (*Id.*). On the date of the incident, Officer Greene had in fact stated that he saw blood coming out of D.H.'s left ear. (Doc. 268-3, Ex. JJ at 18). No other officer indicated seeing blood, although Sgt. Smith stated that he saw a stain on David's shirt that he later associated with crushed berries found inside the house. (Doc. 268, Ex. GG at 18; Doc. 314-1, Ex. M at 14–15). During the incident, the right side of D.H.'s skull was fractured, but nothing in the record suggests that the left side of her head or face was ever injured.

A corrected warrant would have detailed that D.H. was injured on the right side of her head, which was the side of her head that appears to hit the concrete in the video, even though Sgt. Greene stated he saw blood in her left ear. In addition, it would have correctly identified Rachel as D.H.'s mother, not her wife, and noted that David had not stated that he had harmed D.H. inside the house. Plaintiffs point to no evidence in the record, however, to suggest that Det. Lockerby acted recklessly or deliberately by including the inaccurate statements. At most, he was negligent when he failed to investigate the accuracy of statements made to him by other SPD officers, and negligence is insufficient to state a claim for judicial deception. Plaintiffs have not pointed to evidence in the record that creates a genuine issue of material fact regarding Det. Lockerby's state of mind adequate to defeat summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-moving party at summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts"). Det. Lockerby is entitled to summary judgment on the judicial deception claim.

### D.    Claim Eight: Supervisory Liability—Sgt. Smith, Sgt. Slavin, Sgt. Dorer, Lt. O'Halloran

Plaintiffs claim that Sgt. Smith, Sgt. Slavin, Sgt. Dorer, and Lt. O'Halloran are liable as supervisors. Plaintiffs have sought summary judgment with regards to Sgt. Dorer and Sgt. Slavin; Defendants have sought summary judgment with regards to all four. Supervisors are not liable in § 1983 suits under the doctrine of *respondeat superior*, but instead are only liable for their individual commissions or omissions. A supervisor can be liable if he had

"personal involvement" in the constitutional loss or there was "a sufficient causal connection" between his misconduct and the injury. *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991). A supervisor can therefore only be liable if he "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (internal quotation omitted). Police officers who observe fellow officers violating the constitution "can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).

### 1. Sgt. Smith

Plaintiffs have provided no facts to support their claim that Sgt. Smith, in his role as a supervisor, was personally involved with a constitutional violation or that there was a causal connection between his supervisory acts and any of the alleged violations. Discussing supervisory liability in their Response to Defendant's motion, they do not mention Sgt. Smith at all. (Doc. 312 at 21–23). Summary Judgment is granted to Sgt. Smith with regards to supervisory liability.

### 2. Sgt. Slavin

Plaintiffs' supervisory liability claim against Sgt. Slavin is made in connection with his command to Officer Fellows and Officer Garcia to drag David to the paramedics. (Doc. 312 at 23). There is therefore a "sufficient causal connection" between his conduct and the resulting acts for him to incur supervisory liability. *Redman*, 942 F.2d at 1446. However, it is not clear that Sgt. Slavin ordered the officers to drag David face-down, so that his kneecaps were in contact with the asphalt. A reasonable jury could conclude that Sgt. Slavin, in issuing the order, intended that the officers drag David in compliance with police protocol, on his back. Summary judgment is therefore denied to both parties on the supervisory claim against Sgt. Slavin.

1          ### 3.     Sgt. Dorer

2          Plaintiffs claim that Sgt. Dorer is liable as a supervisor for ordering David to be

3   handcuffed, for observing the dragging and not intervening, and for ordering the warrantless

4   search of the house. (Doc. 312 at 23). Summary judgment has been granted to Defendants

5   on the handcuffing claim and is likewise granted to Dorer.

6          Dorer acknowledged that he saw Officer Fellows and Officer Garcia dragging David

7   with his bare knees in contact with asphalt, and acknowledged that he knew "there were more

8   officers there" who could have been used to transport David. (Doc. 266-1 at 238:17). As a

9   supervisory officer, Sgt. Dorer could have ordered other officers to help transport David, and

10  therefore "had an opportunity to intercede" with the ongoing violation. *Cunningham*, 229

11  F.3d at 1289. As noted above, however, there is a material question of fact as to whether a

12  reasonable officer would have understood the extent of the harm caused by the dragging, or

13  whether a reasonable officer would have reasonably believed that the emergency nature of

14  the transportation justified dragging David. Summary judgment is denied to both parties

15  regarding Plaintiff's claim of supervisory liability on the dragging claim.

16         Because Dorer ordered the entry to the house, there was a "sufficient causal

17  connection" between his conduct and the resulting acts for him to incur supervisory liability.

18  *Redman*, 942 F.2d at 1446. Summary Judgment has been granted to Plaintiffs regarding the

19  first warrantless entry. Since Sgt. Dorer ordered this entry, summary judgment is granted to

20  Plaintiffs against him on this claim.

21         ### 4.     Lt. O'Halloran

22         Defendants argue that the claim is barred because Plaintiffs' false arrest claim was

23  dismissed on the pleadings. (Doc. 182). The false arrest claim was dismissed with regards

24  to David's arrest at the end of the incident, based upon the fact that he had issued a threat to

25  D.H. while in the house. (*Id.* at 6–8). The supervisory claim against Lt. O'Halloran, on the

26  other hand, alleges that when O'Halloran supervised the barricade, prior to David threatening

27  to pile drive D.H., the barricade itself constituted an improper arrest.

28                                          - 50 -

Whether or not a person is under arrest is an objective question, answered by whether a reasonable person "would have believed that he was free to leave at any time or to request the officers to leave after the initial encounter." *U.S. v. Johnson*, 626 F.2d 753, 756 (9th Cir. 1980) (a person was arrested when he answered his door and the two men identified themselves as federal agents by showing their drawn firearms). A reasonable person would have not thought he was free to leave after his house was surrounded by police officers, so David was arrested when the barricade was called at 12:34 pm. (Doc. 313-1 Ex. B at 16).[24] Arresting an individual by surrounding him in a residence requires both probable cause and "some exception to the warrant requirement." *U.S. v. Al-Azzawy,* 784 F.2d 890, 894 (9th Cir. 1985).

The barricade situation was established by Officer Hertko at 12:34 pm. (Doc. 313-1, Ex. B at 16). By 1:07 pm, O'Halloran had arrived and taken control of the situation, which Sgt. Dorer confirmed was a barricade. (*Id.* at 33). When he called Assistant Chief Duggan as part of a command notification and described the situation in order to receive an impartial evaluation of the situation, he was told that "it wasn't a SWAT callout yet, that I just barely had a crime." (Doc. 316-4 at 28).

At 12:36, Officer Hertko had broadcast the fact that Walter had told Officer Field that David had said he would throw D.H. out a window if Walter did not come to him. (Doc. 313-1, Ex. B at 19). Parties conceded at the hearing that O'Halloran had been listening to the broadcast at the time he made it, even though O'Halloran himself did not arrive on the scene until 12:55. Although O'Halloran may "barely" have had a crime based upon the fact that David had threatened D.H. with harm, he had probable cause to arrest David for the threat, since probable cause requires "only the probability, and not a prima facie showing, of criminal activity." *Illinois v. Gates*, 462 U.S. 213, 235 (1983). The fact that the threat was

---

[24] The fact that David was in mental crisis and may not have been thinking reasonably is irrelevant to this objective analysis.

issued against a two-year-old child provided exigent circumstances sufficient to effect an arrest to protect the child's safety. *See Brigham City*, 547 U.S. at 400.

Lt. O'Halloran is entitled to summary judgment on the claim that he supervised an unlawful arrest.

### E.   Claim Nine(a): Municipal Liability (City of Scottsdale)

Municipalities may not be held liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Social Services of New York*, 436 U.S. 658, 691 (1978). Ordinarily, a single constitutional deprivation "is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985). Plaintiffs claim that the City is liable under two distinct theories of municipal liability: (1) that SPD and the City were deliberately indifferent to the proper training and supervision of SPD personnel, and (2) that SPD Chief Alan G. Rodbell's approval of the officers' actions qualified as a "ratification" and gives rise to municipal liability. (Doc. 28, ¶¶ 306–309).

Plaintiffs have sought summary judgment on the claim based on the ratification theory, while Defendants have sought summary judgment on the claim under the failure to train theory. (Doc. 265 at 23–25; Doc. 271 at 23–26).

### 1.   Ratification

Under the doctrine of ratification, a municipality may be liable for the acts of an employee who is not a final decisionmaker, so long as an actual final decisionmaker demonstrates that authority to make the decision lay with the subordinate by "approv[ing] [the] subordinate's decision and the basis for it." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). When considering whether policymaking has been delegated to a subordinate, courts consider whether "the official's discretionary decision is 'constrained by policies not of that official's making' and whether the official's decision is 'subject to review by the

municipality's authorized policymakers.'" *Christie v. Iopa*, 176 F.3d 1231, 1236–37 (9th Cir. 1999) (quoting *Praprotnik*, 485 U.S. at 127).

Ratification requires more than a supervisor's subsequent approval of an unconstitutional act. "To hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle respondeat superior liability into section 1983 law." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). Under the ratification theory, a final policymaker, by endorsing the decision of a subordinate to whom he has delegated authority "simply makes clear that the policy was in effect at the time of the incident and was the 'moving force' for the unconstitutional act." *Lancaster v. Carey,* 2011 WL 2198313, at *14 (E.D. Cal. June 6, 2011).

Here, Plaintiffs claim that Chief Rodbell, in approving the decision to shoot and the decision of the Shooting Review Board, acted to ratify the actions of the SPD officers. (Doc. 265 at 24). Defendants do not respond to this argument.[25] Viewed in the light most favorable to the Defendants, however, the evidence does not suggest that Chief Rodbell ratified an unconstitutional use of force. A reasonable jury could believe that Chief Rodbell based his decision on the report of the Shooting Review Board.[26] The decision to use deadly force was

---

[25] Defendants claim that it is "disingenuous[]" to argue that they do not address the ratification claim because they address the *Monell* claim generally and "[r]atification is simply one method of establishing a municipal policy or custom upon which *Monell* liability may be predicated." (Doc. 329 at 12 n.4). In their complaint, however, Plaintiffs state that Defendants are liable under *Monell* both under a failure to train theory and a ratification theory. (Doc. 28 ¶¶ 306–309). Defendants discuss only the failure to train theory, and their general introductory citations to *Monell* do not substitute for directly addressing Plaintiff's ratification argument.

[26] The Shooting Review Board concluded, based on the statements of Sgt. Greene and Sgt. Slavin, that David was shot as he reared back to throw D.H., who was bleeding from the left ear, to the ground. (Doc. 267-1, Ex. X). Any argument that the board's investigation was inadequate does not present a ratification claim under *Praprotnik*.

A municipality may be liable if it has a policy of inadequately investigating misconduct that "should have been visible to any reasonable police administrator." *Larez v.*

"subject to review by the municipality's authorized policymakers," a fact which argues against ratification. *Christie*, 176 F.3d 1236–37. Ordinarily, single instances in which a municipal department fails to discipline an employee for a constitutional violation do not amount to delegation of decision-making authority or ratification of that decision. *See Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996) ("The police officers who shot [the victim] were not officials with final policy-making authority and they were not ordered to shoot by the police chief, the City Council or anyone else possessing final policy-making authority."). Thus, while Plaintiffs may assert this theory at trial, they are not entitled to summary judgment of their *Monell* claim under the ratification theory.

## 2. Failure to Train

Municipalities may only be liable under § 1983 for failing to train employees when the failure both can be traced to the injury suffered by a plaintiff and "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Failing to train a particular officer in a particular policy does not give rise to *Canton* liability, because "absent evidence of a 'program-wide inadequacy in training,' any shortfall in a single officer's training 'can only be classified as negligence on the part of the municipal defendant.'" *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (quoting *Alexander v. City and Cty. of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)). To establish a "policy" of inadequate training, a plaintiff must offer "proof of facts evidencing the local government's awareness of a high probability of harm if the government failed to act." *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1453 (9th Cir. 1991).

---

*City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). Under this theory, a municipality is liable when a "thorough review" of the case file of an Internal Affairs report reveals "glaring deficiencies" in the investigation. *Fuller v. City of Oakland*, 47 F.3d 1522, 1535 (9th Cir. 1995). Plaintiffs do not assert that the City is liable because it has a policy of conducting inadequate internal investigations, and do not cite *Larez* or *Fuller* in their papers.

Plaintiffs submit training materials used by SPD regarding dealing with the mentally ill and employing less-than-lethal force. (Doc. 318-2, Exs. UUU-1, XXX, YYY). They claim that while the training materials are adequate, "[t]here is a distinct difference between (1) presenting training and (2) insuring that officers understand and implement critical learning points." (Doc. 312 at 29). Depositions demonstrate that officers had access to less-than-lethal force, but claim they refrained from using it either because they believed they were out of range or because they believed D.H. would fall if they did. (Doc. 268, Ex. GG at 20). Police negotiators spoke with David on the phone for an extended period of time. (Doc. 313-2, Ex. L-2). No evidence demonstrates that SPD was aware of a "high probability of harm if the government failed to act" by providing further training. *Redman*, 942 F.2d at 1453. At most, some individual officers were not thoroughly familiar with the material that Plaintiffs acknowledge SPD used to train its officers. Even if true, this fact does not give rise to municipal liability on a failure-to-train theory. *Blankenhorn*, 485 F.3d at 484. Defendants are thus entitled to summary judgment on this *Monell* claim.

Summary judgment is therefore granted to Defendants on Plaintiffs' failure-to-train theory and denied to Plaintiffs on their ratification theory. Plaintiffs may pursue their ratification theory at trial.

### F. Claim Nine(b): Battery—Sgt. Doer, Sgt. Slavin, Sgt. Fellows, Sgt. Garcia, and City of Scottsdale

Plaintiffs lodge state law claims against the officers who fired at David, the officers who dragged him, and the City under a traditional *respondeat superior* theory. Defendants seek summary judgment only with regards to the shooting, while Plaintiffs seek summary judgment on both battery claims.

#### 1. Shooting

"An actor is subject to liability to another for battery if the actor intentionally engages in an act that results in harmful or offensive contact with the person of another." *Duncan v. Scottsdale Medical Imaging, Ltd.* 205 Ariz. 306, 309, 70 P.3d 435, 438 (2003). Defendants

rely solely on Arizona's justification statute in defending this claim.

Police officers in Arizona are protected by the state justification statutes, which provide that officers are not subject to civil liability for "engaging in conduct otherwise justified pursuant to the provisions of this chapter." A.R.S. § 13-413. Under the statutes, an officer cannot be liable for using deadly force when the officer reasonably believes "that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay." A.R.S. § 13-410(C)(1)(c). The parties agree that Arizona's justification statutes "mirror the Fourth Amendment standard for the use of deadly force." (Doc. 271 at 27; *see also* Doc. 312 at 31 n.23). As discussed above, summary judgment has been granted to Plaintiffs on their Fourth Amendment claims; the justification statutes therefore provide no defense on the battery claim.

Without the protection of the justification statute, the officers are liable for battery. They shot David in the back while he was walking away from them, causing a "harmful or offensive contact" when David was struck. Summary judgment is entered for Plaintiffs on the shooting portion of claim 9(b).

### 2. Dragging

It is not disputed that Officer Fellows and Officer Garcia dragged David, nor that the contact between his knees and the asphalt resulted in "gaping wounds" to his kneecaps. Defendants argue that "there is no evidence that either Officer Fellows or Garcia intended to harm Hulstedt by transporting him to paramedics." (Doc. 319 at 16). Defendants misstate the standard—in order to be liable for battery, they need not have intended to harm him, but need to have intended "to bring about an offensive contact." RESTATEMENT (SECOND) OF TORTS § 16. Although the officers' mental state is not relevant to the Fourth Amendment analysis, which requires analyzing what a reasonable officer would have realized, it is relevant to a battery analysis, where the officers must have intended to cause the contact, even if they did not intend to cause the injury. Whether the officers' mental state was such that they "intended" to bring about the contact is a question best determined by a jury at trial.

*See Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010) ("Credibility determination, the weighing of the evidence, and the drawing of legitimate inferences from the facts are . . . not those of a judge . . . ruling on a motion for summary judgment."). Plaintiffs are denied summary judgment on their battery claim against Sgt. Fellows and Sgt. Garcia.

### G.   Claim Ten: Negligence—Sgt. Dorer, Sgt. Slavin, Detective Lockerby, and City of Scottsdale

The complaint alleges that Sgt. Dorer and Sgt. Slavin are liable for negligently shooting David, and that Det. Lockerby is liable for negligently preparing his affidavit. Both parties have moved for summary judgment on this claim.

Arizona state courts have established a common-law immunity from mere negligence for police officers "to assure continued vigorous police work." *Landeros v. City of Tucson*, 171 Ariz. 474, 475, 831 P.2d 850, 851 (App. 1992) (quoting *Smith v. State*, 324 N.W. 2d 299, 301 (Iowa 1982)). Police making discretionary decisions while acting in their official capacity in Arizona are only liable "if the plaintiffs establish[] gross negligence." *Clouse ex rel. Clouse v. State*, 199 Ariz. 196, 204, 16 P.3d 757, 765 (2001); *see also Marlowe v. Pinal Cty.*, 2008 WL 4264724 (D. Ariz. Sep. 15, 2008). Plaintiffs have not alleged that the officers engaged in gross negligence, and the time to amend their complaint is long past. Summary judgment is granted to Defendants on Count Ten.

### H.   Claim Eleven: Negligence—Operator Trott and the City of Scottsdale

Plaintiffs allege that Operator Trott's handling of the 9-1-1 call constituted negligence. (Doc. 28 ¶¶ 327–334). Defendants claim that 9-1-1 operators are liable only for gross negligence, citing cases involving police officers and county officials. (Doc. 271 at 28). In fact, while most police employees are only liable for gross negligence, as described above, 9-1-1 dispatchers can be held liable for mere negligence. *Hutcherson v. City of Phx.*, 188 Ariz. 183, 933 P.2d 1251 (App. 1996) (vacated on other grounds by *Hutcherson v. City of Phx.*, 192 Ariz. 51, 961 P.2d 449) (holding that a 9-1-1 operator can be liable for mere negligence in assigning the wrong priority to a call; vacated on a contributory negligence

issue). Plaintiffs may proceed with their claim that Operator Trott was liable for negligently handling the 9-1-1 call.

**I.     Claim Twelve: Defamation—Officer Scritchfield, Officer Greene, Detective Lockerby, and the City of Scottsdale**

Plaintiffs allege that multiple SPD officers made inaccurate statements to health care professionals that D.H. had been injured before David was shot, and inaccurate statements to the news media suggesting that David had committed a crime. (Doc. 28 ¶¶ 335–51). Officer Scritchfield and Officer Greene, who made the statements to medical officials, move for summary judgment on the grounds that the statements were made pursuant to an investigation of child abuse and therefore the officers are immune under Arizona's mandatory reporting law.

The statute creates an affirmative duty for certain people to report suspected child abuse "to a peace officer or to child protective services in the department of economic security." A.R.S. § 13-3620(A). It provides that any person "who furnishes a report, information or records required or authorized under this section . . . is immune from any civil or criminal liability by reason of that action unless the person acted with malice." A.R.S. § 13-3620(J). It also protects from liability "a person who participates in a judicial or administrative proceeding or investigation resulting from a report, information, or records required or authorized under this section." *Id.*

The claim does not concern any reports Officers Scritchfield and Greene made to law enforcement in the course of a child abuse investigation. The statements in question were made to medical professionals. The officers were not reporting child abuse when they spoke to medical officers about D.H.'s injuries. A.R.S. § 13-3620(J). The statute requires that mandatory reporters provide information to "a peace officer or to child protective services in the department of economic security;" it does not require that officers make reports to medical personnel or authorize such statements. A.R.S. § 13-3620(A).

Defendants argue that the statute nevertheless protects them because they are

1    "person[s] who participate[d] in a judicial or administrative proceeding or investigation

2    resulting from a report . . . required or authorized under this section." A.R.S. § 13-3620(J).

3    Any judicial or administrative proceeding in which the officers participated resulted from the

4    standoff and shooting itself, not from their reports of child abuse. Defendants rely on *Ramsey*

5    *v. Yavapai Family Advocacy Ctr.*, 225 Ariz. 132, 138, 235 P.3d 285, 291 (App. 2010), which

6    confirms that Section J protects officers who "only participated in the investigation following

7    Sheets's initial report and did not themselves make 'reports' within the meaning of the

8    statute." Making statements to the medical officers was not part of an "investigation" of the

9    incident or its causes, and Plaintiffs have not sued Defendants for their participation in any

10   truly investigative actions. The mandatory reporting statute does not address reports made

11   to medical officers, even by those otherwise under an obligation to report suspected abuse,

12   and is not applicable to this claim. Summary judgment as to Count Twelve is denied.

13         **J.    Claim Thirteen: Intentional Infliction of Emotional Distress—Sgt. Slavin,**
           **Officer Scritchfield, Officer Clark, Officer Greene, Detective Lockerby,**
14         **Officer Fellows, Officer Garcia**

15         Plaintiffs have claimed that Sgt. Slavin, Officer Scritchfield, Officer Clark, Officer

16   Greene, Det. Lockerby, Officer Fellows, and Officer Garcia are liable for the intentional

17   infliction of emotional distress ("IIED"). To succeed in an IIED claim, Plaintiffs must prove

18   that "the defendant's acts are so outrageous in character and so extreme in degree as to go

19   beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable

20   in a civilized community." *Patton v. First Fed. Sav. and Loan Ass'n of Phoenix*, 118 Ariz.

21   473, 476, 578 P.2d 152, 155 (1978). Officer Scritchfield, Officer Clark, Officer Greene, Det.

22   Lockerby, Officer Fellows, and Officer Garcia have moved for summary judgment on the

23   merits, and Sgt. Slavin has argued that he is protected by Arizona's justification statute.

24         The claims against Officer Clark, Officer Scritchfield, and Det. Lockerby involve

25   statements they made about D.H.'s injuries and David's actions. The record reflects that

26   these statements had been made by other officers at some point, and that at most these

27   officers failed to verify that the statements were true before speaking to medical officials,

28                                            - 59 -

issuing press releases, or including them (while attributing them to other officers) in the search warrant affidavit. Even if such behavior occurred, it is not "atrocious and utterly intolerable in a civilized community." *Patton*, 118 Ariz. at 476. Likewise, while Officer Fellows and Officer Garcia dragged David over the asphalt, they were in fact transporting him to an ambulance; although the dragging may give rise to liability, it did not meet the standard for an IIED claim. Summary judgment will be granted on Count Thirteen for Defendants Clark, Scritchfield, Lockerby, Fellows and Garcia.

The claim against Officer Greene is that he intentionally lied about what he saw when David exited the house so as to make it appear that David, not SPD, was responsible for D.H.'s injuries. On the day of the shooting, Officer Greene was interviewed and described seeing blood flowing from D.H.'s ear in some detail. He confirms that the blood was on her left side, and stated that "it was a nice flow of blood," and that "it was definitely, like a good cut." (Doc. 268-3, Ex. JJ at 19). He said that it appeared that David had "smashed her face," and that "her left side of her face was deformed." (Doc. 268-3, Ex. JJ at 20). He further stated that after David was shot, he stepped forward and held onto D.H. until she was "maybe two or three—two or three feet off the ground. So the child's not that high." (*Id.*). The video recording confirms that D.H. fell from a height of approximately six feet. (Pospisil video). A reasonable jury could find that Officer Greene fabricated his statement to convince others that D.H. was not injured in the fall and that David had injured her in the house, in an effort to make the officers appear justified in shooting David. Such an act would not only have served to implicate David, but would have actively impeded D.H.'s treatment by concealing from her doctors the actual cause of her injury. Making false statements in an official departmental interview in order to implicate the innocent, which incidentally impedes medical treatment to an injured child, is "utterly intolerable in a civilized society." *Patton*, 118 Ariz. at 476. Officer Greene is not entitled to summary judgment on Claim Thirteen.

As noted above, Arizona's justification statute does not provide a defense to Sgt. Slavin. He has not raised any other defense to the IIED claim, so he is not entitled to

summary judgment on Count Thirteen.

### K.    Claim Fourteen: Negligent Infliction of Emotional Distress—Sgt. Slavin and Sgt. Dorer

Count Fourteen alleges that Sgt. Dorer and Sgt. Slavin are liable to D.H. for negligent infliction of emotional distress. As noted above, Arizona state law does not allow for recovery in negligence for police officers acting in the line of duty. *Clouse*, 199 Ariz. at 204. Summary judgment is granted to Defendants on Claim Fourteen.

### L.    Claim Fifteen: Loss of Consortium—Sgt. Slavin and Sgt. Dorer

Defendants argue that the justification statues protect Sgt. Slavin and Sgt. Dorer from the loss of consortium claim. As noted above, the justification defense is not available when officers violate the Fourth Amendment, and can therefore provide no defense here. Defendants are not entitled to summary judgment on Claim Fifteen.

### CONCLUSION

When David came out of the house carrying D.H., the officers had a legitimate interest in protecting her from the imminent threat of falling or the possibility of being thrown to the ground. Before using force, the officers were required to consider not only that interest, but all of the facts and circumstances of the situation. Any reasonable officer would have concluded that shooting David would result in D.H.'s falling six feet onto a paved surface, as indeed it did.

Finding disputed issues of fact in favor of Defendants, the officers fired at David even though by doing so they were certain to cause the very harm they were allegedly acting to prevent. Moreover, the officers did not consider the totality of the circumstances, including the fact that they could have injured or killed D.H. Moreover, it was clearly established at the date of the incident that officers were required to issue warnings that they would use deadly force, not merely give orders, before firing. Plaintiffs are entitled to summary judgment on Count One.

In the handcuffing claim in Count Two, Plaintiffs allege merely that David was

handcuffed, not that excessive force was used in handcuffing him, The video evidence suggests that the force used to handcuff him was minimal, so Defendants are granted summary judgment on the handcuffing claim. Whether Defendants made a reasonable mistake regarding the harm they were causing by dragging David is a question for a jury, so summary judgment is denied to both parties.

There was no reasonable justification for believing that there were "occupants" in the house when officers conducted two sweeps after the shooting. Furthermore, Defendants provide no evidence to suggest that Sgt. Dorer had reason to believe D.H. had been injured inside the house when he conducted his first sweep, and the officers who conducted the second sweep rely only on hearsay from paramedics to support their sweep in search of medication. Summary judgment is therefore granted to Plaintiffs on the portion of Claim Seven involving the warrantless searches. Since Plaintiffs point to no evidence in the record suggesting that Det. Lockerby possessed the necessary mental state to support a judicial deception claim, Defendants are granted summary judgment on that claim.

Sergeant Smith and Lt. O'Halloran are granted summary judgment in the supervisory liability claim in Claim Eight on the merits, as is Sgt. Dorer for ordering David to be handcuffed. Summary judgment is granted to Plaintiffs on the claim that Sgt. Dorer supervised the first warrantless search  There are genuine issues of fact regarding Sgt. Slavin and Sgt. Dorer regarding the dragging claims, so  summary judgment is denied to both parties regarding the dragging claims.

Defendants are granted summary judgment on the failure-to-train theory of *Monell* liability in Claim Nine(a), and Plaintiffs are denied summary judgment on the ratification theory. Plaintiffs may continue to pursue Claim Nine(a), but only upon the ratification theory and not upon any other theory of *Monell* liability.

The officers are not protected by the justification statutes under state law because they violated the Fourth Amendment when they shot David. Since shooting David in the back constituted a battery, Plaintiffs are granted summary judgment with regards to the shooting

allegations in Claim Nine(b). The allegations that Officer Fellows and Officer Garcia committed a battery by dragging David to the ambulance rest on contested issues of fact involving the officers state of mind, so summary judgment would be inappropriate.

Arizona law prohibits simple negligence claims against police officers, so Claim Ten and Claim Fourteen are dismissed. Police dispatchers and 9-1-1 operators may be liable in Negligence, so Claim Eleven survives. The officers who made allegedly defamatory statements were not reporting suspected child abuse to peace officers as required under the mandatory reporting law, so they are not protected by that law's immunity, and Claim Twelve survives. None of the alleged conduct in Claim Thirteen rises to the level sufficient to state a claim for Intentional Infliction of Emotional Distress except for the conduct of Officer Greene. Claim Thirteen is therefore dismissed as to all Defendants other than Officer Greene and Sgt. Slavin, who sought protection only through the justification defense. Defendants likewise rely only on the justification statute to move for summary judgment on Claim Fifteen, and summary judgment is therefore denied.[27]

---

[27] The Court issued an order granting Defendants' motion to exclude the testimony of an expert witness compensated through a contingency fee arrangement on January 20, 2012. (Doc. 331). Plaintiffs filed a Motion for Reconsideration on February 17. (Doc. 334). Absent good cause shown, such motions "shall be filed no later than fourteen (14) days after the date of the filing of the Order that is the subject of the motion." LRCiv. 7.2(g)(2). Plaintiffs' counsel allege that they have good cause to file an untimely motion because they were busy working on other cases and their motion for Certification for Issues of Interlocutory Appeal. (Doc. 333 at 3). "Good cause" primarily considers a party's diligence in filing the motion. *See Johnson v. Mammoth Recreation Inc.* 975 F.2d 604, 609 (9th Cir. 1992) (analyzing good cause in the context of Federal Rule of Civil Procedure 16). The fact that Plaintiffs were working on other motions, in this and other cases, does not provide good cause to file an untimely motion for reconsideration, and the motion is denied.

Plaintiffs have also moved for the Court to certify an interlocutory appeal on the issue of whether testimony of an expert witness retained under a contingency fee is admissible in a Section 1983 suit. (Doc. 334). A district court may provide that an otherwise unappealable order may be appealed when it determines that "such order involves a controlling question of law as to which there is substantial ground for difference of opinion," and "that an immediate appeal from the order may materially advance the ultimate termination of the

1          **IT IS THEREFORE ORDERED:**

2          1.      Plaintiffs' Motion for Partial Summary Judgment (Doc. 265) is **granted in**

3   **part** and **denied in part**.

4          2.      Defendants' Motion for Partial Summary Judgment (Doc. 271) is **granted in**

5   **part** and **denied in part**.

6          3.      The remaining claims are as follows:

7                  A.      On Claim One, summary judgment is **entered for Plaintiffs**.

8                  B.      On Claim Two, summary judgment is **entered for Defendants** on the

9   handcuffing claim and **denied to both parties** on the dragging claim.

10                 C.      On Claim Seven, summary judgment is **entered for Plaintiffs** on the

11  warrantless search allegations. (Doc. 28 ¶¶ 290–296). Summary judgment is **entered for**

12  **Defendants** on the judicial deception claim. (Doc. 28 ¶¶ 297–301).

13                 D.      On Claim Eight, summary judgment is **entered for Defendant** on the

14  claims against Sgt. Slavin, and Lt. O'Halloran, and for Sgt. Dorer regarding the handcuffing.

15  Summary judgment is **entered for Plaintiffs** against Sgt. Dorer regarding the warrantless

16  search. Summary judgment is **denied to both parties** with regards to the dragging claims.

17  Summary judgement is **denied to both parties** with regards to Sgt. Slavin.

18                 E.      Claim Nine(a) survives only with regards to the ratification claim (Doc.

19  28 ¶308) and is otherwise **dismissed**.

20                 F.      On Claim Nine(b), summary judgment is **entered for Plaintiffs** against

21  Dorer and Slavin regarding the shooting. Summary judgment is **denied to both parties**

22  regarding Officer Fellows' and Garcia's dragging David to the ambulance.

23                 G.      Claim Ten is **dismissed**.

24  _____

25  litigation." 28 U.S.C. § 1292(b) (2006). Plaintiffs have been granted summary judgment on
26  the shooting count without the testimony of their witness. Allowing an interlocutory appeal
27  on an issue that could not materially affect the outcome of that judgment would not advance
    the ultimate termination of the litigation, and Plaintiffs' motion is denied.

28

        H.       Claim Eleven survives.

        I.        Claim Twelve survives

        J.       Claim Thirteen survives only with regards to Officer Greene and Sgt. Slavin, and is otherwise **dismissed**.

        K.      Claim Fourteen is **dismissed**.

        L.      Claim Fifteen survives.

    4.    Plaintiffs' Motion for Reconsideration (Doc. 333) and Motion for Certification of Issue for Interlocutory Appeal (Doc. 333-34) are both **denied**.

DATED this 6th day of August, 2012.

*A. Murray Snow*

/G. Murray Snow
United States District Judge